UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

**ALICIA WHITE,**
  **c/o Fraternal Order of Police**
**242 West 29th Street**
**Baltimore, Maryland 21211**

**And**

**WILLIAM PORTER**
**242 West 29th Street**
**Baltimore, Maryland 21211**

    **Plaintiffs,**

**vs.**

                        **Civil No.: MJG-16-2663**

  **MARILYN MOSBY**
  **c/o Office of State's Attorney**
  **120 East Baltimore Street**
  **Baltimore, Maryland 21202**

  **AND**

  **MAJOR SAMUEL COGEN, e**
  **c/o Baltimore City Sheriff's Office**
  **250 City Hall**
  **Baltimore, Maryland 21202**

    **And**

**STATE OF MARYLAND**
**Serve on:**
**Nancy Kopp, Treasurer**
**Louis L. Goldstein Treasury Building**
**80 Calvert Street, Room 109**
**Annapolis, MD 21401**

    **Defendants.**

---

## SECOND-AMENDED COMPLAINT & JURY DEMAND

Plaintiffs Alicia White and William Porter, by and through their attorneys, Michael E.

Glass, MBA, Esq. and The Michael Glass Law Firm and Tony N. Garcia, Esq and Bates and

1

Garcia LLC, file suit against Defendants Marilyn Mosby, Samuel Cogen, and the State of Maryland, file this Second-Amended Complaint and Jury Demand, and state the following in support thereof:

The Complaint and Jury Demand filed on May 2, 2016 is incorporated as if fully set forth herein with the intention of relating back to the initial filing on May 2, 2016.

## THE PARTIES

1. Plaintiff Alicia White is and was, at all times relevant, a resident of Baltimore, Maryland, and a sergeant with the Baltimore City Police Department.

2. Plaintiff William Porter is and was, at all times relevant, a resident of Baltimore County, Maryland, and an officer with the Baltimore City Police Department.

3. Defendant Marilyn Mosby is and was, at all times relevant, the State's Attorney for Baltimore City, Maryland.

4. Defendant Samuel Cogen is and was, at all time relevant, a Major with the Baltimore City Sheriff's Office.

5. Defendant, the State of Maryland, employs Defendants Mosby and Cogen through the Baltimore City State's Attorney's Office and the Baltimore City Sheriff's Department, respectively.

## JURISDICTION & VENUE

6. Plaintiffs placed Defendants on notice of their claims as required by the Maryland Tort Claims Act (Maryland Code, State Government, §§ 12-101 *et seq.*) by mailing the required notices (and supplemental notices) via certified, first-class U.S. mail, postage prepaid, return receipt requested (and hand-delivered), to Nancy Kopp, State Treasurer, Goldstein Treasury Building, 80 Calvert Street, Annapolis, Maryland 21401, within the requisite period of time. Alternatively, Plaintiffs placed Defendants on notice of their claims

in substantial compliance with the Maryland Tort Claims Act. Alternatively, Defendants waived the notice requirement for Plaintiffs under the Maryland Tort Claims Act and/or such notice was not required to the extent that Defendants conduct was outside the scope of employment, committed with malice, and/or was grossly negligent.

7.    This Court has subject matter jurisdiction as the amount in controversy exceeds $30,000.00, and venue is proper pursuant to MARYLAND CODE ANNOTATED, COURTS & JUDICIAL PROCEEDINGS Article, § 6-201 and §6-202 since the actions Plaintiffs complain of occurred and arose in the City of Baltimore, State of Maryland.

### *Facts as to Plaintiff Alicia White*

8.    On or about May 1, 2015, Plaintiff Alicia White was wrongfully arrested and imprisoned as a result of her involvement in the lawful arrest of Freddie Carlos Gray, Jr. which occurred on April 12, 2015.

9.    On the morning of April 12, 2015, Officers Edward Nero ("Nero") and Garrett Miller ("Miller") were on bicycle patrol on North Avenue in Baltimore, Maryland.

10.    Lieutenant Rice was ahead of Plaintiffs Nero and Miller on his bicycle.

11.    Lieutenant Rice began pursuing two suspects on Calhoun Street and announced the pursuit over his police radio.

12.    In response to the radio call, Nero and Miller rode down Mount Street in the direction of Lieutenant Rice.

13.    Nero observed one of the two suspects and attempted to apprehend him.

14.    Miller pursued the second suspect, later identified as Freddie Carlos Gray, Jr. (hereinafter, "Mr. Gray").

15.    Miller detained Mr. Gray for officer safety and requested Nero to retrieve his

3

bicycle, which he had left behind in the foot chase.

16.     Nero –who had been an Emergency Medical Technician in New Jersey—did not observed that Mr. Gray was in medical crisis.

17.     Miller recovered a knife from Mr. Gray's person and lawfully placed him under arrest.

18.     As soon as Mr. Gray realized he was being placed under arrest, he became physically and verbally combative. As a result of his combativeness, a crowd of citizens began to form.

19.     When the police wagon arrived to take custody of Mr. Gray, Mr. Gray was uncooperative and refused to walk on his own to the wagon.

20.     Nero and Officer Novak then picked up Mr. Gray and took him to the wagon. At this time, Mr. Gray continued to be uncooperative.

21.     Before he was placed fully into the police wagon, Mr. Gray stood on the back step of the wagon while Nero conducted a second search to confirm that Mr. Gray did not possess any other weapons or contraband on his person. During this search, Mr. Gray was standing under his own power.

22.     Once Mr. Gray was fully inside the police wagon, he began banging and slamming himself against the inside of the wagon causing the wagon to visibly shake.

23.     Due to Mr. Gray's continuous screaming and yelling, a larger crowd of citizens had formed around the Nero and Miller and the other officers. In the interest of officer safety, Rice directed Miller to tell the police wagon driver to take the wagon approximately one block south in order to complete the paperwork for Mr. Gray's arrest and then to proceed directly to Central Booking.

24.     At that time, Mr. Gray was taken out of the police wagon so that his handcuffs

4

could be switched with flex ties and leg shackles could be placed on him. Nero was setting his bicycle on the ground next to the police wagon as Mr. Gray was being taken out of the vehicle.

25.     During this time, Mr. Gray continued to be uncooperative. He was alert and responsive, and continued to yell and scream. Another crowd of citizens began to crowd around the police wagon. The citizens were yelling and shouting at the officers.

26.     Once Mr. Gray had been placed in leg shackles and flex ties, he was placed back into the wagon. At this time, he continued to bang the inside of the wagon causing the wagon to violently shake back and forth.

27.     Nero and Miller arrested a second man and called for a police wagon to respond to their current location. The police wagon still containing Mr. Gray responded to the scene on North Avenue to collect the second arrestee.

28.     At this time, Miller and Rice took Mr. Gray out of the wagon, where his handcuffs were switched out with flex ties. Shackles were placed on Mr. Gray's legs because he was thrashing and banging the inside of the police wagon. Mr. Gray continued to flail and scream during this time. Rice called for additional units, as a crowd of citizens had, once again, begun to gather around the police wagon.

29.     Mr. Gray was placed back into the police wagon, where he continued to bang against the door, causing the wagon to rock back and forth. Miller handed Mr. Gray's paperwork to the driver of the police wagon, and the wagon departed.

30.     After the police wagon departed, Plaintiffs Miller and Nero traveled back to North Avenue, where they stopped another suspect. The suspect was subsequently arrested, and Lieutenant Rice called for additional units and a police wagon to transport the individual.

31.     Plaintiff White responded to the call for backup with Officer Wood and proceeded to North Avenue.

32.     She spoke with Lt. Rice and asked about what they had, whether the person apprehended was young or old, and what was going on because she had received supervisor complaints.  Lt. Rice stated that she could go over and speak with him.

33.     Plaintiff White approached the rear of the police wagon and looked in.

34.     She saw Mr. Gray sitting in-between the seat and the floor of the back of the police wagon, with his head down, leaning over.

35.     She attempted to speak with him, but he did not respond, however, Plaintiff White heard him making noises.  She also saw him breathing.  At this time, she did not see that Mr. Gray was in any kind of distress, and concluded that his non-responsiveness was due to Mr. Gray continuing to be uncooperative and non-compliant.

36.     At that point, Plaintiff White stopped speaking to Mr. Gray, got back into her patrol car and left the scene.

37.     Plaintiff White did not have any conversations up until that point with anyone else suggesting that Mr. Gray was in distress and needed medical attention.

38.     After the second arrestee was placed inside the wagon at North Avenue, the wagon departed.

39.     When Plaintiff White returned to the Western District, she saw officers attempting to take Mr. Gray out of the police wagon.

40.     Plaintiff White heard one officer ask whether Mr. Gray was breathing, at which point, Plaintiff White advised to call a medic.  This was the first time that Plaintiff White had any reason to believe that Mr. Gray needed medical attention.

41.     At that point, an officer informed Plaintiff White that a medic had already been called.  Plaintiff White then got on the radio to confirm that a medic was en route.  Indeed, as soon as Plaintiff White was aware that Mr. Gray was in distress, she took immediate steps to

facilitate him getting medical attention.

### *Facts Common to Plaintiff Porter*

42.     This case arises from the wrongful arrest and imprisonment of Plaintiff William Gerald Porter ("Porter") on May 1, 2015. Plaintiff Porter was wrongfully arrested and imprisoned as a result of his involvement in the legal arrest of Freddie Carlos Gray, Jt. in Baltimore City, Maryland on April 12, 2015.

43.     On the morning of April 12, 2015, Plaintiff Porter was working "Baker Shift" during the hours of 7:00 a.m. to 5:30 p.m. in the capacity as a patrol officer. Plaintiff Porter was assigned to a Baltimore Police Department patrol car, and was required to patrol the Western District geographic area.

44.     On the morning of April 12, 2015, Officer Porter was in the midst of inspecting the assigned patrol vehicle when he received a radio dispatch announcing a foot chase in the area of Westwood Avenue and Bruce Street. Plaintiff Porter discontinued the inspection of the vehicle and responded to the area of the foot chase.

45.     In the process of monitoring the radio transmissions pertaining to the foot chase, Plaintiff Porter discerned that Officer Edward Nero and Officer Garrett Miller had detained a suspect. Further, Plaintiff Porter leaned that Lieutenant Brian Rice had requested help canvassing the rear of Mount Street, near Bruce Street and Fulton Avenue.

46.     Plaintiff Porter proceeded to the area of Bruce Street and Fulton Avenue to assist Lt. Rice in the search for the second person believed to be with the individual   detained by Officer Edward Nero and/or Officer Garrett Miller. Neither Plaintiff Porter or Lieutenant Rice located the second individual.

47.     While with Lieutenant Rice Plaintiff Porter could hear an individual yelling. The yelling appeared to be coming from the area where Officer Nero and Officer Miller had detained an individual. Additionally, Plaintiff Porter heard residents of the neighborhood yelling random

statements and voicing opinions about the detention of the suspect. The yelling appeared to be coming from an area approximately one block from Plaintiff Porter's location, in the area of Presbury Street.

48.     Plaintiff Porter proceeded to walk over to the area of Presbury Street and Mount Street to assist in crowd control. It was not uncommon for residents of the area where the activity was taking place to become vocal and interject opinions concerning police activity. At this time Plaintiff Porter was unaware of the identity of the individual who was arrested by Officer Nero and/or Officer Miller, nor did he have any interaction with the individual who was arrested.

49.     Plaintiff Porter returned to his patrol car and heard radio communication indicating a request for an additional unit at Baker Street and Mount Street. At this time Plaintiff Porter responded to the area of Baker Street and Mount Street. Plaintiff Porter pulled his patrol vehicle within approximately 20 feet of the location of a Baltimore Police Department transport wagon, observing from a distance several officers engaged in the placement of an individual into the transport wagon.

50.     While at this location Plaintiff Porter observed more loud and continuous interjecting by neighborhood residents, and engaged in conversation with at least one of the residents who was loudly objecting to the arrest of the individual who was taken into custody.

51.     At this time Plaintiff Porter could observe that the arrested individual who was fully inside the police wagon appeared to be banging and slamming himself against the inside of the wagon causing the wagon to visibly shake. It is at this time that Plaintiff Porter was advised that the individual inside of the transport wagon was Freddie Gray. At this time the transport wagon left the area.

52.     Plaintiff Porter returned to his patrol vehicle and intended on commencing his patrol duties when he heard a radio call from the operator of the transport wagon requesting

that an additional police unit respond to the intersection of Druid Hill Avenue and Dolphin Street. Plaintiff Porter responded to this intersection to assist the transport wagon operator. Officer Caesar Goodson was operating the transport wagon.

54. When Plaintiff Porter responded to the intersection of Druid Hill Avenue and Dolphin Street the transport wagon was stopped and parked at this location.

54. Officer Goodson exited the transport wagon and was greeted by Plaintiff Porter. Officer Goodson opened the exterior door to the transport wagon and Plaintiff Porter opened the interior door.

55. Plaintiff Porter observed Freddie Gray lying on the floor of the vehicle. Mr. Gray's head was at the front of the transport compartment of the vehicle and his body was wedged between the interior dividing wall and the wheel well partition that was secured to the bench that runs along the exterior wall of the transport wagon. Mr. Gray was in a prone position, with his feet at the rear area of the transport compartment.

56. Mr. Gray said "help" as he appeared to notice that Plaintiff Porter was opening the rear interior door. Plaintiff Porter responded by saying "what do you mean help?" Mr. Gray then replied by requesting that Plaintiff Porter provide assistance in helping him get up. Mr. Gray did not appear to be in any medical distress, nor did he complain of any injury at this time. Plaintiff Porter grabbed Mr. Gray under his arms, which were handcuffed behind his back, and assisted Mr. Gray to a sitting position on the bench of the transport wagon. Plaintiff Porter was unable to fit into the compartment with Mr. Gray in the compartment, and removed himself by backing out of the transport compartment.

57. While interacting with Mr. Gray, Plaintiff Porter inquired how they were going to be able to continue with transporting Mr. Gray to the Baltimore City Central Booking and Intake Facility. Knowing that many detainees are trying to avoid being transported to the

detention facility, Plaintiff Porter inquired if Mr. Gray wanted to see a medic and/or if he wanted medical help. Although making this request, Plaintiff Porter observed no exigent medical need, and observed Mr. Gray to be able to sit upright, breathe and communicate with Plaintiff Porter.

58. Mr. Gray, despite no signs of exigent medical needs, indicated that he did want to have medical assistance. Plaintiff Porter anticipated that Mr. Gray would not be permitted to be processed through the Baltimore City Central Booking and Intake Facility because of his request for some medical assistance. As such, Plaintiff Porter advised Officer Goodson that he would need to transport Mr. Gray to the hospital.

59. Plaintiff Porter returned to his patrol car. Both the interior and exterior rear doors of the transport wagon were open when he walked away from the transport wagon, leaving Officer Goodson with Mr. Gray.

60. As Plaintiff Porter returned to his patrol car he heard a radio transmission that requested additional units at the area of North Avenue and Carey Street. Plaintiff Porter proceeded to that location.

61. Upon arriving at this location Plaintiff Porter observed that several officers had arrested another individual and they were in the process of placing him in the transport wagon that contained Mr. Gray. The police wagon containing Mr. Gray had traveled to North Avenue, at which point the second arrestee was placed in the wagon. Plaintiff Porter did not have involvement with the arrest of the second subject, but was able to look into the back of the transport wagon and observed Mr. Gray to be kneeling on the floor of the transport wagon, leaning against the bench within the transport compartment of the wagon. Plaintiff Porter inquired of Mr. Gray if he still wanted to go to the hospital and Mr. Gray responded in the affirmative. Plaintiff Porter conveyed this information to another police officer at the scene.

62.     Plaintiff Porter was advised that he would need to respond to the hospital with Mr. Gray since the other officers, who were operating bicycles, would need to stay together. Plaintiff Porter was instructed to meet the transport wagon at the Western District.

63.     Plaintiff Porter traveled to the Western District as instructed. When he arrived at the district, the second subject arrested at North Avenue and Carey Street had already been removed from the transport wagon. Plaintiff Porter walked to the transport wagon and upon opening the door of the transport wagon on the side of the compartment where Mr. Gray was confined called out Mr. Gray's name. Mr. Gray was unresponsive.

64.     Plaintiff Porter tapped Mr. Gray and Mr. Gray did not respond. At this time another officer started to render emergency assistance and Plaintiff Porter called for a medic.

65.     Plaintiff Porter was ordered to accompany the medic unit to the hospital, where he stayed until relieved of his duty.

*Facts Common to all Counts*

66.     Mr. Gray was taken to the University of Maryland Shock Trauma Unit.

67.     On April 19, 2015, Mr. Gray passed away after undergoing surgery at the University of Maryland Shock Trauma Unit.

68.     On May 1, 2015, charges were filed against Plaintiffs White and Porter concerning their alleged actions during the legal arrest of Mr. Gray on April 12, 2015 pursuant to an Application for Statement of Charges submitted by Defendant Cogen.  Plaintiff White was charged with manslaughter, involuntary manslaughter, second degree assault, and misconduct in office. Plaintiff Porter was charged with involuntary manslaughter, assault in the second degree, and misconduct in office.

69.     The Application for Statement of Charges submitted by Defendant Cogen stated that Mr. Gray's death was ruled a homicide by the Office of the Chief Medical

11

Examiner.

70.    The State's Attorney's Office, however, sought to influence the Medic Examiner's opinions and finding by withholding relevant, material, and truthful information (including, but not limited to prior conditions and injuries, such as a prior back injury).

71.    The same day, Plaintiffs were arrested and processed at Baltimore City's Central Booking Intake Center. The process took several hours to complete, during which time Plaintiffs White and Porter were deprived of their liberty and held against their will. There existed no legal justification to arrest or detain Plaintiffs.

72.    Also on May 1, 2015, Marilyn Mosby ("Mosby"), State's Attorney for Baltimore City, gave a press conference concerning her office's decisions to press charges against Plaintiffs White and Porter, along with four other officers of the Baltimore City Police Department.

73.    During this press conference, Ms. Mosby read the Application for Statement of Charges filed against Plaintiffs White and Porter, and the other charged officers, which contained false statements, and spoke in a divisive and inciting manner.

74.    At the time of the press conference, Ms. Mosby knew that this incident had garnered national attention and that there would be wide-spread media coverage. She also knew or should have known that her press conference violated Maryland Rule of Professional Conduct 3.6(a) ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.").

75.    Ms. Mosby stated that the knife recovered from Mr. Gray by Plaintiffs was "not

a switchblade and [was] lawful under Maryland law." The knife recovered from Mr. Gray was spring-assisted and was, therefore, illegal under Article 19, Section 59-22 of the Baltimore City Code. Ms. Mosby had served as an Assistant State's Attorney for Baltimore City from 2005- 2012 and knew that spring-assisted knives were illegal in Baltimore City.

76.    Ms. Mosby stated that Officers Goodson, Miller and Nero "failed to establish probable cause for Mr. Gray's arrest as no crime had been committed by Mr. Gray. Accordingly . . . Officer Miller and Officer Nero illegally arrested Mr. Gray." This statement was false, as the knife, which was legally seized from Mr. Gray, was illegal under Article 19, Section 59-22 of the Baltimore City Code. Ms. Mosby knew that Plaintiffs Miller and Nero had probable cause to arrest Mr. Gray.

77.    Ms. Mosby state that "Sgt. Alicia White [and] Officer Porter observed Mr. Gray unresponsive on the floor of the wagon. Sgt. White who is responsible for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest spoke to the back of Mr. Gray's head. When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic. She made no effort to look or assess or determine his condition."

78.    The State's Attorney went outside the scope of her employment, as a State's Attorney by acting in an investigative capacity that formed the basis for the charges brought against Plaintiffs.

79.    The State's Attorney's Office, however, allegedly did an investigation wherein it manipulated evidence to facilitate indictments of the Plaintiffs and other officers.

80.    Ms. Mosby also made several statements during her May 1, 2015 press conference regarding the independent investigation conducted by the Office of the State's Attorney for Baltimore City.

81.    The press conference statements include, but are not limited to, the following:

    a.       "Once alerted about this incident on April 13, investigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr. Gray's apprehension. Over the course of our independent investigation, in the untimely death of Mr. Gray, my team worked around the clock; 12 and 14 hour days to canvass and interview dozens of witnesses; view numerous hours of video taped statements; surveyed the route; reviewed voluminous medical records; and we leveraged the information made available to us by the police department, the community, and the family of Mr. Gray."

    b.       "The findings of our comprehensive, thorough and independent investigation, coupled with the medical examiner's determination that Mr. Gray's death was a homicide, which we received today, has led us to believe that we have probable cause to file criminal charges."

    c.       "We have conducted a thorough and independent investigation of this case."

    d.       "We have been working with the police department from day one, and from day one I also sent my own investigators to the scene."

    e. "We independently verified those facts and everything we received from the police department, so it's a culmination of the independent investigation that we conducted as well as the information we received from the police department."

    f. "Well, what I can say is that from the beginning, we knew that this was a serious case, we've been working independently, and I can tell you that we put all of our resources to make sure that we are pursuing and

14

leading where the facts took us in this case, which was to pursue justice."

g.     "I can tell you that from day one, we independently investigated, we're not just relying solely upon what we were given by the police department, period."

h.     "I thought it was very important to have an independent analysis as to what took place and transpired from the very beginning. We are independent agencies from the police department."

i. "I can tell you, as I stated, we had a number of investigators, you can see it's been an all hands on approach, from the very beginning, so I sent my investigators out to the scene, we have a number of them who are right here, we have a working collaboration and are working with the Baltimore Sheriff's Department, who has police powers and, again, independent from the Baltimore City Police Department. So yes, we have leveraged the police investigation, but at no point did we compromise our own independent investigation into this case."

82.     Further, Ms. Mosby's made statements for purposes of quelling the riots rather than prosecuting police officers who had committed crimes, such as: "To the people of Baltimore and the demonstrators across America: I heard your call for 'No justice, no peace.' Your peace is sincerely needed as I work to deliver justice on behalf of this young man.  To those that are angry, hurt or have their own experiences of injustice at the hands of police officers I urge you to channel that energy peacefully as we prosecute this case.  I have heard your calls for 'No justice, no peace,' however your peace is sincerely needed as I work to deliver justice on behalf of Freddie Gray."

83.     She also stated: "Last but certainly not least, to the youth of the city.  I will seek

justice on your behalf.  This is a moment.  This is your moment.  Let's insure we have peaceful and productive rallies that will develop structural and systemic changes for generations to come.  You're at the forefront of this case and as young people, our time is now."

84.    In so doing, Ms. Mosby went well beyond and exceeded the authority and role of the State's Attorney's Office as prosecutor and brought charges against police officers that were wholly unsupported by evidence and probable cause and for a purpose other than her role: prosecuting those who had committed crimes, and by conducting a bogus and sham investigation that did not turn up any evidence that supported the charges against Plaintiffs

85.    Indeed, during her alleged investigation, Mosby created false facts and omitted material facts in order to create, with Cogen's complicity and assistance, a false Statement of Charges designed to support securing indictments against Plaintiffs.

86.    During her alleged investigation, Mosby further created false and misleading facts to present to the grand jury, and omitted material exculpatory facts, to secure an indictment.

87.    By way of example but not limitation, Mosby represented to the grand jury, upon information and belief, and to the Commissioner (with and through Cogen) in the Statement of Charges that:

a. Plaintiffs were under a legal duty to restrain Mr. Gray in a seatbelt when, in fact, no such legal duty existed;

b. Plaintiffs observed "Mr. Gray unresponsive on the floor of the wagon," which was not true.  Indeed, Mosby and Cogen omitted that Plaintiffs specifically stated that they did not observe that Mr. Gray was in any distress (until the final stop at the Western District).

c. "When [Mr. Gray] did not respond, [Plaintiff White] did nothing further despite the fact that she was advised that he needed a medic." Yet, such statement was patently false since, indeed, Plaintiff White called for a medic as soon as she was aware that Mr. Gray was in medical distress.

d. "Despite Mr. Gray's seriously deteriorating medical condition, no medical assistance was rendered or summonses for Mr. Gray at that time by [either Plaintiff]. Such statement, however, was patently false since there was no evidence to support that Mr. Gray was in medical distress at any point that Plaintiffs had any interaction with him, until Plaintiff White called for medical assistance at the van's final stop.

88.    Mosby developed these false and misleading facts during her so-called independent investigation.

89.    Mosby, however, omitted that a first-hand witness, Donta Allen –who was in the van with Freddie Gray— noting that not only was Freddie Gray conscious during much of the ride, but was banging his head against the wall, indicating that he was not in a serious state for much of the ride.

90.    Mosby and Cogen omitted that another witness, Mark Gladhill, saw Mr. Gray in the van and observed that he was in a "praying position," not that he was in any medical distress.

91.    Mosby and Cogen omitted that the medics who came onto the scene and examined Mr. Gray after Plaintiff White called them not once, but twice, determined that Freddie Gray's neck was "Normal," and that other "significant physical exam findings" stated that "client was arrested for suspected drug possession **so possible drug ingestion or overdose was treated** as well as trauma etiology." Indeed, Mosby and Cogy withheld from

17

the Commissioner and the grand jury that not even the medical professionals that arrived on the scene were able to determine that Gray had suffered any serious physical trauma.

92.     Upon information and belief, Mosby proceeded to prepare a script that was to be read  to the grand jury by Detective Dawnyell Taylor that contained misleading facts – including but not limited to those in the Statement of Charges—and omitted exculpatory facts.

93.     Mosby and Cogen had a legal obligation not to mislead a grand jury into indicting Plaintiffs based on false and misleading evidence, and omitting material, exculpatory facts.

94.     At the time that Defendant Cogen filed the Application for Statement of Charges, Defendant Cogen knew that no probable cause existed that neither Plaintiff White nor Plaintiff Porter had committed any crime.

95.     Defendant Cogen either knew that no evidence supported the Statement of Charges against Plaintiffs by directly or indirectly participating in the State's Attorney's alleged "thorough," "independent" investigation, or made materially false statements and omitted material facts in the Statement of Charges deliberately, with a reckless disregard of the truth, and with a reckless indifference to determining the veracity of the allegations which he attested to under oath under penalty of perjury.

96.     Such material omissions included that when Mr. Gray when and how Mr. Gray died was undetermined, that Plaintiff Porter and Plaintiff White did not know, and could not reasonably have known, that Mr. Gray was in distress prior to the last stop when help was immediately summoned, at that when Mr. Gray was severely injured was not known.

97.     Defendant Cogen further falsely described Mr. Gray's physical condition as him being in "obvious and recognized need for medical assistance" without any facts whatsoever to support this bald allegation.

98.     Defendant Cogen falsely stately that Plaintiff White "did nothing further [to help Mr. Gray] despite the fact that she was advised that he needed a medic."  Defendant Cogen, however, falsely and deliberately omitted that Officer Porter believed that Mr. Gray asked for a medic for purposes of being taken to the hospital to avoid being processed, rather than because that he was in need of medical assistance.

99.     Without any probable cause, Defendant Cogen baldly and falsely stated that Plaintiff White "made no effort to look, assess or determine [Mr. Gray's] condition" when, in fact, she did check on Mr. Gray and did not see any indication that he was in distress.

100.    Defendant Cogen materially omitted that it was Plaintiff White who instructed other officers to call for a medic, and then followed up again when the medic did not promptly arrive, as soon as she knew that Mr. Gray was in distress, as she clearly stated in her Recorded Statement.

101.    In the alternative, Defendant Mosby instructed Defendant Cogen to file the Application for Statement of Charges, either directly and/or by instructing another member of the Baltimore City State's Attorney's office to instruct Defendant Cogen to file the Application for Statement of Charges. Defendant's Mosby's direct involvement in the filing of the Application for Statement of Charges is evidenced by her statements during the May 1, 2015 press conference that "we have probable cause to file criminal charges" and "We have brought the following charges" even though the Application for Statement of Charges was filed by Defendant Cogen and not by the Baltimore City State's Attorney's Office.

102.    Alternatively, Mosby provided erroneous legal advice to Defendant Cogen, prior to his filing of the Application for Statement of Charges, that probable cause existed to charge and arrest Plaintiffs White and Porter, even though Defendant Mosby knew, prior to the filing of the Application for Statement of Charges that no probable cause existed that either

19

Plaintiff White or Porter had committed any crime. Defendant Mosby provided this erroneous legal advice either directly to Defendant Cogen and/or instructing another member of the Baltimore City State's Attorney's office to provide this erroneous legal advice to Defendant Cogen. Notwithstanding this erroneous legal advice, Defendant Cogen knew, or should have known, that no probable cause existed to bring charges against and arrest Plaintiffs Porter and White.

103.    As a result of the improper actions of Defendants Mosby and Cogen, Plaintiffs White and Porter were illegally arrested on May 1, 2015. Their illegal arrests were made without probable cause and were done either negligently or, in the alternative, intentionally, with ill will, improper motivation and/or evil purpose. They were falsely charged as a direct result of an improperly motivated investigation, false charges and deliberate and reckless false statements made by Defendants Mosby and Cogen with a reckless disregard for the truth--and improper legal advice provided to Defendant Cogen and the Office of the State's Attorney for Baltimore City—brought for the purpose of stopping the riots rather than prosecuting charges supported by probable cause.

104.    Indictments of the Plaintiffs were obtained from the grand jury by the State's Attorney offering false and misleading statements, omitting material facts, and presenting the purported evidence in a biased and materially suggestive manner.

105.    On or about May 11th, 2015  Baltimore City Police Detective Dawnyell Taylor was assigned as lead detective in the criminal investigation into the death of Freddy Gray.

106.    On or about May 21st 2015, a Grand Jury was convened for the presentation of evidence by agents of Defendant Mosby in order to secure an indictment of Plaintiffs as well as Baltimore City Police Officers, Edward Nero, Officer Miller, Officer Goodson, and Lieutenant Brian Rice.

107.     On or about May 21st, 2015 Detective Dawnyell Taylor was given a four-page document from Assistant State's Attorney Janice Bledsoe to be read to the Grand Jury that was incomplete, misleading, biased, and partially false.

108.     On or about May 21, 2015 Detective Dawnyell Taylor was sworn in to testify before the Baltimore City Grand Jury, and even after expressing her concern to the agents of Defendant Mosby that information was going to be provided to the Grand Jury which was misleading she was instructed to read aloud a four page document containing false information including but limited to that Freddy Gray was tasered prior to arrest by the arresting Officers.

109.     On or about May 21, 2015, Detective Dawnyell Taylor was sworn in before the Baltimore City Grand Jury, and even after expressing her concern to the agents of Defendant Mosby that information was going to be provided to the Grand Jury which was misleading such as, and not limited to,  statements from the plaintiffs and other Baltimore City Police Officers which were incomplete, lacking context, and doctored in order to make it appear that the plaintiffs and other Officers gave statements incriminating each other.

110.     On or about May 21, 2015, Detective Dawnyell Taylor observed Defendant Marilyn Mosby sitting in the Grand Jury room joking, laughing, and talking with members of the sworn Grand Jury panel prior to their decision to indict Plaintiffs as well as Baltimore City Police Officers, Edward Nero, Officer Miller, Officer Goodson, and Lieutenant Brian Rice. Defendant Mosby remained sitting in the Grand Jury room next to a Deputy State's Attorney during the swearing in of the Detetctive, the reading of a four page document containing the misleading and partially false information, questions presented by the Grand Jury members and answered by agents of Defendant Mosby.

111.     On or about May 21, 2015, before the Grand Jury convened to decide whether to indict Plaintiffs, Marilyn Mosby watched as her agents interjected and prevented Detective

Dawnyell Taylor from responding to Grand Jury questions.

112.    On or about May 21, 2015, before the Grand Jury convened to decide whether to indict Plaintiffs, Marilyn Mosby watched as Detective Dawnyell Taylor repeatedly informed the Grand Jury that the information that the Grand Jury received was not from her investigation but from a four page document provided by the agents of Defendant Mosby.

113.    As a result of this incident, Plaintiffs Porter and White lost their freedom and dignity and suffered physical and psychological harm from being arrested and detained without cause.

114.    At all times, Defendants Mosby and Cogen were acting under the color of law and within the scope of their employment or, in the alternative, beyond the scope of their employment.

115.    At all times, Defendant Mosby and Cogen acted negligently or, in the alternative, with gross negligence and/or with actual malice directed at Plaintiff White and Plaintiff Porter, with the intent to cause harm to the Plaintiffs by trampling on the Plaintiffs' rights in furtherance of the Defendants' own personal interests and political agendas, and/or with reckless disregard for the truth in the allegations brought in the Statement of Charges.

## COUNT I – DEFAMATION
### *(Plaintiffs White & Porter v. State of Maryland)*

116.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

117.    Defendant Mosby sought to falsely charge, arrest and imprison Plaintiffs White and Porter.

118.    Defendant Cogen drafted and signed the Statement of Charges and Defendant Mosby read them at a press conference on May 1, 2015.

119.    In the press conference on May 1, 2015, Defendant Mosby announced that both Plaintiffs "assessed Mr. Gray's condition and at no point did either of them restrain Mr. Gray per BPD general order nor did they render or request medical assistance."

120.    Defendant Mosby further stated in her press conference in an effort to falsely charge Plaintiffs White and Porter that "Sgt. Alicia White, Officer Porter and Officer Goodson observed Mr. Gray unresponsive on the floor of the wagon. Sgt. White who is [sic] responsible for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest spoke to the back of Mr. Gray's head. When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic. She made no effort to look or assess or determine his condition."

121.    These statements were defamatory because they exposed Plaintiffs to public scorn, hatred, and contempt, thereby discouraging others in the community from having a favorable opinion of, or associating with, Plaintiffs.

122.    These statements were published verbally, in the written media, broadcast on local and national television, and disseminated on the worldwide web and are reasonably recognizable as being defamatory.

123.    These statements are provably false as the facts and evidence in no way support that Plaintiffs White and Porter determined that Mr. Gray was in crisis and then ignored his need for medical attention. Indeed, the facts and evidence show that both Plaintiffs sought medical attention as soon as it was determined that Mr. Gray was in distress.

124.    Defendant Mosby had a duty to not publish false and defamatory statements about Plaintiffs, and breached that duty in her press conference by making and publishing such statements.

125.    As a direct and proximate result of the false and defamatory statements

published by Defendant Mosby, the character and reputation of each of the Plaintiffs were harmed, their standing and reputation in the Baltimore City Police Department and the community at large –locally, nationally, and internationally—were impaired, they suffered and continue to suffer mental pain and anguish, and humiliation.

126.    As a direct and proximate result of the false and defamatory statements, Plaintiffs were placed on administrative leave with no pay, and have suffered, and continue to suffer, monetary damages in the form of lost income, lost raises in salary, and lost promotions.

WHEREFORE, Plaintiffs White and Porter demand compensatory damages in excess of $75,000, plus interest, costs, attorneys' fees, and any other relief as this Court deems proper.

COUNT II – DEFAMATION (Malice in the Alternative)
*(Plaintiffs White & Porter v. Defendants Mosby & Cogen)*

127.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

128.    Defendants Mosby and Cogen sought to falsely charge, arrest and imprison Plaintiffs White and Porter.

129.    Defendant Cogen drafted and signed the State of Charges, which Defendant Mosby read at a press conference on May 1, 2015.

130.    Among other comments, in the press conference on May 1, 2015, Defendant Mosby announced that both Plaintiffs "assessed Mr. Gray's condition and at no point did either of them restrain Mr. Gray per BPD general order nor did they render or request medical assistance."

131.    Defendant Mosby further stated in her press conference in an effort to falsely charge Plaintiffs White and Porter that "Sgt. Alicia White, Officer Porter and Officer Goodson observed Mr. Gray unresponsive on the floor of the wagon. Sgt. White who is [sic] responsible

for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest spoke to the back of Mr. Gray's head.  When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic.  She made no effort to look or assess or determine his condition."

132.   These statements were defamatory because they exposed Plaintiffs to public scorn, hatred, and contempt, thereby discouraging others in the community from having a favorable opinion of, or associating with, Plaintiffs.

133.   These statements were published verbally, in the written media, broadcast on local and national television, and disseminated on the worldwide web and are reasonably recognizable as being defamatory.

134.   These statements are provably false as the facts and evidence in no way support that Plaintiffs White and Porter determined that Mr. Gray was in crisis and ignored his need for medical attention.  Indeed, the facts and evidence show that both Plaintiffs sought medical attention as soon as it was determined that Mr. Gray was in distress.

135.   Defendant Mosby went outside the scope of her employment as a State's Attorney by holding a press conference, acting in an investigative capacity, reading the statement of charges to the public, and made the aforementioned false and defamatory statements with knowledge of their falsity and with the intent to harm Plaintiffs White and Porter.   Specifically, Defendant Mosby falsely charged Plaintiffs and made false and defamatory statements for purposes other than prosecuting criminal acts, such as appeasing the public and quelling the riots.

136.   As a direct and proximate result of the false and defamatory statements published by Defendant Mosby, the character and reputation of each of the Plaintiffs were harmed, their standing and reputation in the Baltimore City Police Department and the

community at large –locally, nationally, and internationally—were impaired, they suffered

and continue to suffer mental pain and anguish, and humiliation.

137.    Additionally, as a direct and proximate result of the false and defamatory

statements, Plaintiffs were placed on administrative leave with no pay, and have suffered, and

continue to suffer, monetary damages in the form of lost income, lost raises in salary, and lost

promotions.

WHEREFORE, Plaintiffs White and Porter demand compensatory damages in excess

of $75,000, punitive damages in excess of $75,000, plus interest, costs, attorneys' fees,  , and any

other relief as this Court deems proper.

## COUNT III– INVASION OF PRIVACY: FALSE LIGHT
### *(Plaintiffs White and Porter v. Defendant State of Maryland)*

138.    The foregoing paragraphs are incorporated by reference as if fully set forth

herein.

139.    Defendants Mosby and Cogen sought to falsely charge, arrest and imprison

Plaintiffs White and Porter.

140.    Defendant Cogen drafted and signed the Statement of Charges.

141.    In a press conference on May 1, 2015, Defendant Mosby announced that both

Plaintiffs "assessed Mr. Gray's condition and at no point did either of them restrain Mr. Gray

per BPD general order nor did they render or request medical assistance."

142.    Defendant Mosby further stated in her press conference in an effort to falsely

charge Plaintiffs White and Porter that "Sgt. Alicia White, Officer Porter and Officer Goodson

observed Mr. Gray unresponsive on the floor of the wagon.  Sgt. White who is [sic] responsible

for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest spoke to the

back of Mr. Gray's head.  When he did not respond, she did nothing further despite the fact

that she was advised that he needed a medic.  She made no effort to look or assess or determine his condition."

143.   These statements were highly published and publicized not only verbally in the press conference, but also in the written media, broadcast on local and national television, and disseminated on the worldwide web.

144.   These statements were intended to support criminal charges and to create the impression and conclusion among the public that Plaintiffs knew that Mr. Gray was in distress and in need of medical attention, but then ignored his medical needs and did nothing.

145.   These statements therefore placed Plaintiffs in a false position by attributing to them characteristics, conduct and beliefs which are false.

146.   Indeed, the statements and evidence reviewed by Defendants Mosby and Cogen supported that as soon as Plaintiffs White and Porter were aware that Mr. Gray was in distress, they immediately sought medical attention for Mr. Gray.

147.   Defendant Cogen drafted and signed the Statement of Charges that Defendant Mosby publicized to the public at large.

148.   Defendants Mosby and Cogen knew, based on the officers' statements and other evidence they reviewed, that the statement of charges and other statements Defendant Mosby made in her May 1, 2015 press conference were false.

149.   Defendants Cogen and Mosby had a duty to Plaintiffs not to criminally charge Plaintiffs when such charges were unsupported by the facts and evidence.  Defendant Mosby further had a duty not to publish such false statements about Plaintiffs.

150.   Defendants Cogen and Mosby breached their duty to Plaintiffs by bringing unsupported criminal charges and then publicly publishing same.

151.   These among other statements were made not for purposes of prosecuting

crimes that had allegedly been committed by White and Porter, but rather for purposes of quelling the riots in Baltimore.

152. The false charges brought by Defendants Cogen and Mosby and publicized by Mosby, along with other statements, were made in a manner which is highly offensive to a reasonable person considering the customs of the time and place of the alleged wrongdoing by Defendants.

153. As a direct and proximate result of the false statements published by Defendant Mosby and placing Plaintiffs in a false light, the character and reputation of each of the Plaintiffs were harmed, their standing and reputation in the Baltimore City Police Department and the community at large –locally, nationally, and internationally—were impaired, they suffered and continue to suffer mental pain and anguish, and humiliation.

154. Additionally, as a direct and proximate result of the false statements and placing Plaintiffs in a false light, Plaintiffs were placed on administrative leave with no pay, and have suffered, and continue to suffer, monetary damages in the form of lost income, lost raises in salary, and lost promotions.

WHEREFORE, Plaintiffs White and Porter demand compensatory damages in excess of $75,000, plus interest, costs, attorneys' fees, punitive damages in excess of $75,000, and any other relief as this Court deem proper.

### COUNT IV– INVASION OF PRIVACY: FALSE LIGHT (Malice in the Alternative)
*(Plaintiffs White and Porter v. Defendants Mosby & Cogen)*

155. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

156. Defendants Mosby and Cogen sought to falsely charge, arrest and imprison Plaintiffs White and Porter.

157.    Defendant Cogen drafted and signed the Statement of Charges.

158.    In a press conference on May 1, 2015, Defendant Mosby announced that both Plaintiffs "assessed Mr. Gray's condition and at no point did either of them restrain Mr. Gray per BPD general order nor did they render or request medical assistance."

159.    Defendant Mosby further stated in her press conference in an effort to falsely charge Plaintiffs White and Porter that "Sgt. Alicia White, Officer Porter and Officer Goodson observed Mr. Gray unresponsive on the floor of the wagon.  Sgt. White who is [sic] responsible for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest spoke to the back of Mr. Gray's head.  When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic.  She made no effort to look or assess or determine his condition."

160.    These statements were highly published and publicized not only verbally in the press conference, but also in the written media, broadcast on local and national television, and disseminated on the worldwide web.

161.    These statements were intended to support criminal charges and to create the impression and conclusion among the public that Plaintiffs knew that Mr. Gray was in distress and in need of medical attention, but then ignored his medical needs and did nothing.

162.    These statements therefore placed Plaintiffs in a false position by attributing to them characteristics, conduct and beliefs which are false.

163.    Indeed, the statements and evidence reviewed by Defendants Mosby and Cogen supported that as soon as Plaintiffs White and Porter were aware that Mr. Gray was in distress, they immediately sought medical attention for Mr. Gray.

164.    Defendant Cogen drafted and signed the Statement of Charges that Defendant Mosby publicized to the public at large.

165.    Defendants Mosby and Cogen knew, based on the officers' statements and other evidence they reviewed, that the statement of charges and other statements Defendant Mosby made in her May 1, 2015 press conference were false.

166.    Indeed, Mosby made the statements with knowledge of their falsity and with reckless disregard of their falsity in a manner that is highly offensive to a reasonable person.

167.    These among other statements were made not for purposes of prosecuting crimes that had allegedly been committed by White and Porter, but rather for purposes of quelling the riots in Baltimore.

168.    The false charges brought by Defendants Cogen and Mosby and publicized by Mosby, along with other statements, were made in a manner which is highly offensive to a reasonable person considering the customs of the time and place of the alleged wrongdoing by Defendants.

169.    As a direct and proximate result of the false statements published by Defendant Mosby and placing Plaintiffs in a false light, the character and reputation of each of the Plaintiffs were harmed, their standing and reputation in the Baltimore City Police Department and the community at large –locally, nationally, and internationally—were impaired, they suffered and continue to suffer mental pain and anguish, and humiliation.

170.    Additionally, as a direct and proximate result of the false statements and placing Plaintiffs in a false light, Plaintiffs were placed on administrative leave with no pay, and have suffered, and continue to suffer, monetary damages in the form of lost income, lost raises in salary, and lost promotions.

WHEREFORE, Plaintiffs White and Porter demand compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, attorneys' fees, and any other relief as this Court deems proper.

## COUNT V–FALSE ARREST
### *(Plaintiffs White and Porter v. Defendant State of Maryland)*

171.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

172.    Defendants, their agents, and their employees unlawfully deprived Plaintiffs of their liberty.

173.    Plaintiffs did not consent to the deprivation of their liberty and were held against their will for an extended period of time.

174.    Defendants, their agents, and their employees were without legal justification for depriving Plaintiffs of their liberty.

175.    As a direct and proximate result of the false imprisonment by Defendants, their agents, and their employees, Plaintiffs have sustained emotional, mental, and physical pain and suffering, missed time from work and leisure activities, past and future medical expenses; and loss of earning capacity.

WHEREFORE, Plaintiffs White and Porter demand compensatory and monetary damages in excess of $75,000, plus interest, costs, attorneys' fees, and any other relief as this Court deems proper.

## COUNT VI–FALSE ARREST (Actual Malice in the Alternative)
### *(Plaintiffs White and Porter v. Defendants Mosby & Cogen)*

176.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

177.    Defendants Cogen and Mosby, their agents, and their employees unlawfully deprived Plaintiffs of their liberty.

178.    Plaintiffs did not consent to the deprivation of their liberty and were held against their will for an extended period of time.

179.   Defendants, their agents, and their employees were without legal justification for depriving Plaintiffs of their liberty.

180.   The conduct of Defendants, their agents, and their employees was grossly negligent, reckless, and/or perpetrated with actual malice. Indeed, Plaintiffs were arrested not in pursuit of prosecuting criminal conduct allegedly perpetrated by Plaintiffs, but rather for a personal and political agenda of Defendants Cogen and Mosby to, among other things, (1) assuage an angry constituency by placing blame on Plaintiffs for the death of Freddie Gray, (2) quell the riots, (3) further the personal ambitions and political agenda of Mosby and Cogen, among other reasons.

181.   There was no probable cause for arresting Plaintiffs, and the arrests were made with a reckless disregard of the consequences affecting the life and property of Plaintiffs, and a thoughtless disregard of the grave consequences to Plaintiffs, without any effort on the part of Defendants Mosby and Cogen to avoid them.

182.   The injuries inflicted on Plaintiffs by Defendants Cogen and Mosby were done wantonly and willfully with such utter indifference to the rights of Plaintiffs that Defendants Mosby and Cogen acted in complete disregard of Plaintiffs' rights as if such rights did not exist.

183.   As a direct and proximate result of the false imprisonment by Defendants, their agents, and their employees, Plaintiffs have sustained emotional, mental, and physical pain and suffering, missed time from work and leisure activities, past and future medical expenses; and loss of earning capacity.

WHEREFORE, Plaintiffs White and Porter demand compensatory and monetary damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, attorneys' fees, and any other relief as this Court deems proper.

COUNT VII–FALSE IMPRISONMENT
*(Plaintiffs White and Porter v. Defendant State of Maryland)*

184.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

185.    Defendant Mosby and Cogen, their agents, and their employees unlawfully deprived Plaintiffs of their liberty.

186.    Plaintiffs did not consent to the deprivation of their liberty and were held against their will for an extended period of time.

187.    Defendants Mosby and Cogen, their agents, and their employees were without legal justification for depriving Plaintiffs of their liberty.

188.    As a direct and proximate result of the false imprisonment by Defendants, their agents, and their employees, Plaintiffs have sustained emotional, mental, and physical pain and suffering, missed time from work and leisure activities, past and future medical expenses; and loss of earning capacity.

WHEREFORE, Plaintiffs White and Porter demand compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, attorneys' fees, and any other relief as this Court deems proper.

COUNT VIII–FALSE IMPRISONMENT (Malice in the Alternative)
*(Plaintiffs White and Porter v. Defendants Mosby and Cogen)*

189.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

190.    Defendants Mosby and Cogen, their agents, and their employees unlawfully deprived Plaintiffs of their liberty.

191.    Plaintiffs White and Porter did not consent to the deprivation of their liberty and were held against their will for an extended period of time.

33

192.   Defendants, their agents, and their employees were without legal justification for depriving Plaintiffs White and Porter of their liberty.

193.   The conduct of Defendants, their agents, and their employees was grossly negligent, reckless, and/or perpetrated with actual malice.  Indeed, Plaintiffs were arrested not in pursuit of prosecuting criminal conduct allegedly perpetrated by Plaintiffs, but rather for a personal and political agenda of Defendants Cogen and Mosby to, among other things, (1) assuage an angry constituency by placing blame on Plaintiffs for the death of Freddie Gray, (2) quell the riots, (3) further the personal ambition and political agendas of Mosby and Cogen, among other reasons.

194.   There was no probable cause for arresting Plaintiffs, and the arrests were made with a reckless disregard of the consequences affecting the life and property of Plaintiffs, and a thoughtless disregard of the grave consequences to Plaintiffs, without any effort on the part of Defendants Mosby and Cogen to avoid them.

195.   The injuries inflicted on Plaintiffs by Defendants Cogen and Mosby were done wantonly and willfully with such utter indifference to the rights of Plaintiffs that Defendants Mosby and Cogen acted in complete disregard of Plaintiffs' rights as if such rights did not exist.

196.   As a direct and proximate result of the false imprisonment by Defendants, their agents, and their employees, Plaintiffs have sustained emotional, mental, and physical pain and suffering, missed time from work and leisure activities, past and future medical expenses; and loss of earnings and earning capacity.

WHEREFORE, Plaintiffs White and Porter demand monetary and compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, and attorneys' fees, and any other relief as this Court deems proper.

COUNT IX – MARYLAND DECLARATION OF RIGHTS (Articles 24 & 26)
(*Plaintiffs White and Porter v. Mosby & Cogen*)

197.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

198.   Defendants Mosby and Cogen, their agents, and their employees violated Plaintiffs' civil and constitutional rights, including their rights under Articles 24 and 26 of the Maryland Declaration of Rights.

199.   The Defendants' actions were without legal justification and resulted in the false arrest and false imprisonment of Plaintiffs and directly caused injury to Plaintiffs.

200.   As a direct result of Defendants Mosby's and Cogen's actions, Plaintiffs were taken, imprisoned, disseized of their freehold, liberties and privileges, outlawed, exiled, destroyed, deprived of their life, liberty and property without the judgment of their peers or by the law of the land and were subjected to an illegal search and seizure.

201.   All of Plaintiffs' injuries, damages, and losses were solely and proximately caused by Defendants Mosby and Cogen, their agents, and their employees, with no negligence on the part of Plaintiffs contributing thereto.

202.   As a direct and proximate result of Defendants Mosby and Cogen violating articles 24 and 26 of the Maryland Constitution, Plaintiffs have sustained emotional, mental, and physical pain and suffering, missed time from work and leisure activities, past and future medical expenses; and loss of earnings and earning capacity.

WHEREFORE, Plaintiffs White and Porter demand compensatory and monetary damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, attorneys' fees, and any other relief as this Court deems proper.

COUNT X – VIOLATION OF RIGHTS SECURED UNDER 42 U.S.C. §1983
(*Plaintiffs White and Porter v. Mosby & Cogen*)

203.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

204.    Defendants Mosby and Cogen, in their individual capacity and within the scope of their employment, acted intentionally to violate Plaintiff White's and Porter's rights secured under Chapter 42, Section 1983 of the United States Code. Defendants Mosby and Cogen engaged in activities that violated Plaintiffs White's and Porter's rights as protected under the Constitution of United States of America.

205.    The acts and omissions of Defendants Mosby and Cogen detailed within this Complaint, including, but not limited to, the filing of the Application for Statement of Charges without probable cause, the allegations made by Cogen either with actual malice or with a reckless disregard for the truth, the false arrest and false imprisonment of Plaintiffs White and Porter, without probable cause or a valid arrest warrant, the providing of erroneous legal advice by Defendant Mosby to Defendant Cogen, and the false statements made by Defendant Mosby at her May 1, 2015 press conference regarding Plaintiffs White and Porter, deprived Plaintiffs White and Porter of their rights under 42 U.S.C. § 1983, including, but not limited to:

a.      freedom from the deprivation of liberty without due process of the law, as guaranteed by the Fourteenth Amendment to the Constitution of the United States of America; and

b.      freedom from arrest without probable cause, as guaranteed by the Fourth Amendment to the Constitution of the United States of America.

206.    Plaintiffs White and Porter have a right to be free from arrest and detention without probable cause, legal excuse, or justification and without a valid warrant. This right

was denied when Plaintiffs White and Porter were arrested and detained without probable cause, legal excuse, or justification or a valid arrest warrant.

207.   Plaintiffs White and Porter have a right to be free from wrongful imprisonment. This right was denied when Plaintiffs White and Porter were wrongfully imprisoned without legal cause, excuse, or justification.

208.   Plaintiffs White and Porter have a protected property interest in their freedom, their ability to exercise their free will and domain over their persons, and their ability to be free from unlawful and unwelcome detention by Defendant Mosby.

209.   Plaintiffs White and Porter were afforded less process than was due under law by Defendant Mosby and Defendant Cogen, in depriving them of the rights in question.

210.   Defendant Mosby and Defendant Cogen, at all times relevant hereto, acted under color of law and in a manner that was not objectively reasonable.

211.   Additionally, Defendant Mosby, at all times relevant hereto, acted in an investigatory role and participated in investigative work to decide whether Plaintiffs White and Porter should be arrested and in instructing Defendant Cogen to file the Application for Statement of Charges.

212.   Furthermore, in making the false statements regarding Plaintiffs White and Porter during her May 1, 2015 press conference, Defendant Mosby was not acting in her role as an advocate for the State or as a prosecutor of criminal conduct.

213.   By the actions detailed above, Defendant Mosby's and Defendant Cogen's conduct violated Plaintiffs White's and Porter's clearly established statutory or constitutional rights of which a reasonable person would have known. Defendant Mosby and Defendant Cogen deprived Plaintiffs White and Porter of their constitutional rights under 42 U.S.C. § 1983, including, but not limited to, freedom from wrongful arrest and detention without

probable cause or valid arrest warrant, and freedom from wrongful imprisonment without probable cause or valid arrest warrant.

214.  As a result of the deprivation of Plaintiffs White's and Porter's rights, Plaintiffs White and Porter were subjected to unnecessary and unlawful arrest, detention, and imprisonment.

215.  Plaintiffs White and Porter further alleges that all of their injuries, losses, and damages – past, present and prospective – were caused solely by the conduct, actions, and inactions of Defendant Mosby and Defendant Cogen, as set forth herein, without any negligence, want of due care, or provocation on the part of the Plaintiffs White and Porter, either directly or indirectly.

216.  As a direct and proximate result of these acts, Plaintiffs White and Porter suffered damages including, among others, the following: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation; indignities and severe embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; restrictions of all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational and professional opportunity, athletic opportunity, personal fulfillment, family relations, reading, television, movies, travel, enjoyment, and expression.

WHEREFORE, Plaintiffs White and Porter demand monetary and compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, and attorneys' fees, and any other relief as this Court deems proper.

COUNT XI- MALICIOUS PROSECUTION
(Plaintiff White and Porter v Mosby and Cogen)

217.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

218.   On or about May 1, 2015 Defendant Mosby, her agents, and their employees caused Defendant Cogen to swear out an application for an arrest warrant before a Commissioner of the District Court of Maryland for Baltimore City for the arrest of Plaintiffs charging the Plaintiff White with manslaughter, involuntary manslaughter, second degree assault, and misconduct in office. Plaintiff Porter was charged with involuntary manslaughter, assault in the second degree, and misconduct in office.

219.   At the time Defendant Cogen and Defendant Mosby filed the Application for Statement of Charges, Defendants knew that no probable cause existed that Plaintiffs had committed any crime.

220.   Pursuant to the said application, a warrant was issued, and Plaintiffs on May 1, 2015 was arrested, booked, fingerprinted, photographed, and detained at the Central Booking Intake Facility for hours. Thereafter Plaintiff was released after posting bail to appear in the District Court of Maryland for Baltimore City for a preliminary hearing on the aforementioned charges.

221.   On or about July 27, 2016 Defendant Mosby entered a nolle prosequi in both Plaintiffs' cases.

222.   Defendants acted with malice and/or with a reckless disregard of the truth, and without probable cause in causing the warrant against Plaintiffs to be issued and in prosecution of the case. Malice was the primary purpose of Defendants in instituting the

proceeding against Plaintiffs.

223.   Plaintiff Porter has been engaged as full time Baltimore City Police Officer since June 21, 2013, while Plaintiff White has worked for the Baltimore City Police since 2010. They worked until April 21st 2015, when they were placed on leave. In this capacity, Plaintiffs were authorized to make arrests and perform other such duties as required. Defendants Mosby and Cogen were at all times fully aware that the Plaintiffs possessed such authority.

224.   Plaintiffs were placed on leave as a direct result of Defendant's false accusations.

225.   As a result of the actions of the Defendants, Plaintiffs White and Porter suffered, and will continue to suffer: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation; indignities and severe embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; restrictions of all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational and professional opportunity, athletic opportunity, personal fulfillment, family relations, reading, television, movies, travel, enjoyment, and expression.

226.   WHEREFORE, Plaintiffs White and Porter demand monetary and compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, and attorneys' fees, and any other relief as this Court deems proper.

## COUNT XII- ABUSE OF PROCESS
(Plaintiff White and Porter v. Mosby and Cogen)

227.   The foregoing paragraphs are incorporated by reference as if fully set forth

herein.

228.    On or about May 1, 2015 Defendant Mosby, her agents, and their employees caused Defendant Cogen to swear out an application for an arrest warrant before a Commissioner, District Court of Maryland for Baltimore City for the arrest of Plaintiffs charging the Plaintiff White with manslaughter, involuntary manslaughter, second degree assault, and misconduct in office. Plaintiff Porter was charged with involuntary manslaughter, assault in the second degree, and misconduct in office.

229.    At the time Defendant Cogen and Defendant Mosby filed the Application for Statement of Charges, Defendants knew that no probable cause existed that Plaintiffs had committed any crime.

230.    Pursuant to the said application, a warrant was issued, and on May 1, 2015 Plaintiffs were arrested, booked, fingerprinted, photographed, and detained at the Central Booking Intake Facility for hours. Thereafter Plaintiffs were released after posting bail to appear in the District Court of Maryland for Baltimore City for a preliminary hearing on the aforementioned charges.

231.    On or about July 27, 2016 Defendant Mosby entered a nolle prosequi in both Plaintiffs' cases.

232.    By instituting the aforesaid proceedings, Defendants Mosby and Cogen, in their individual capacity and within the scope of their employment, willfully misused the criminal process for an improper purpose, namely, to create a public spectacle for political purposes. In doing so, they willfully used process after it had issued in a manner not contemplated by law. Defendants acted with the ulterior motive of furthering political support

for Mosby and motivating the legislature to act, rather than seeking an end result through the judicial system.

233.   As a result of the actions of the Defendants, Plaintiffs White and Porter suffered, and will continue to suffer: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation; indignities and severe embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; restrictions of all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational and professional opportunity, athletic opportunity, personal fulfillment, family relations, reading, television, movies, travel, enjoyment, and expression.

WHEREFORE, Plaintiffs White and Porter demand monetary and compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, and attorneys' fees, and any other relief as this Court deems proper.

COUNT XIII- CIVIL CONSPIRACY
(Plaintiff White and Porter v. Mosby and Cogen)

234.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

235.   On or about May 1, 2015 Defendant Mosby, her agents, and their employees caused Defendant Cogen to swear out an application for an arrest warrant before a Commisioner, District Court of Maryland for Baltimore City for the arrest of Plaintiffs charging the Plaintiff White with manslaughter, involuntary manslaughter, second degree assault, and misconduct in office. Plaintiff Porter was charged with involuntary manslaughter, assault in the second degree, and misconduct in office.

236.   At the time Defendant Cogen and Defendant Mosby filed the Application for Statement of Charges, Defendants knew that no probable cause existed that Plaintiffs had

committed any crime.  In filing the false charges, Defendants entered into an agreement whereby Defendant Cogen agreed to the false charges requested by Defendant Mosby, for the purpose of allowing  Defendant Mosby to pursue an improper political agenda by abusing the judicial system.

237.   Defendants Mosby and Cogen, knowing that the Statement of Charges were not supported by probable cause, entered into an agreement whereby the two would work jointly to file the Statement of Charges for purposes other than to prosecute criminal conduct, including but not limited to for political purposes.

238.   Cogen and Mosby conspired to work together to file the Statement of Charges despite knowing of the falsity of the claims and the lack of probable cause.

239.  As a result of Defendants Cogen and Mosby's conspiracy, Plaintiffs White and Porter suffered, and will continue to suffer: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation; indignities and severe embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; restrictions of all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational and professional opportunity, athletic opportunity, personal fulfillment, family relations, reading, television, movies, travel, enjoyment, and expression.

WHEREFORE, Plaintiffs White and Porter demand monetary and compensatory damages in excess of $75,000, punitive damages in excess of $75,000, plus interest, costs, and attorneys' fees, and any other relief as this Court deems proper.

Respectfully submitted,

_____/S/_____

Tony N. Garcia, Esq
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201
( 410-814-4600
(410) 814-4604 (f)
tony@batesgarcia.com

_____/S/_____
Michael E. Glass, MBA, Esq.
The Michael Glass Law Firm
201 N. Charles Street, Suite 1901
Baltimore, MD  21201
(410) 779-0600
(410) 814-4604 (f)
mglass@mglasslaw.com

*Attorney for Plaintiffs Alicia White and William Porter*


## PRAYER FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues raised herein.


_____

Tony N. Garcia, Esq.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this September 1, 2016, a copy of the foregoing

Motion, Order, and clean and stricken Amended Complaint were served, via first class mail, postage

prepaid, and via the Court's electronic filing system on:

Ankush Nayar, Esq.
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
tel. (410) 576-6300
fax (410) 576-7841
email: anayar@oag.state.md.us
*Attorney for Defendants*

Jason Robert Foltin, Esq.
Baltimore City Law Department
100 Holliday St. Lower Level
Baltimore, MD 21202
tel. (410) 396-3297
fax (410) 837-1152
email: Jason.foltin@oag.state.md.us
*Attorney for Defendants*

Sarah Elaine Gross, Esq.
Baltimore City Law Department
100 Holliday St. Lower Level
Baltimore, MD 21202
tel. (410) 396-3297
fax (410) 837-1152
email: sarah.gross@oag.state.md.us
*Attorney for Defendants*

/s/ Tony Garcia,
Tony Garcia, Esq.