## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **ALICIA WHITE,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WILLIAM PORTER** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No.: MJG-16-2663** |
| | ) | |
| **MARILYN MOSBY** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MAJOR SAMUEL COGEN,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF MARYLAND** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

### PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION
### TO DEFENDANTS' MOSBY'S & COGEN'S MOTIONS TO DISMISS

Plaintiffs Alicia White ("White") and William Porter ("Porter"), by and through their attorneys, Michael Glass, Esquire of The Michael Glass Firm LLC and Tony N. Garcia, Esquire of Bates & Garcia LLC submit this Combined Memorandum in Opposition to the motion to dismiss filed by Defendant Marilyn Mosby ("Defendant Mosby") and the motion to dismiss filed by Defendant Major Samuel Cogen ("Defendant Cogen") and state:

# TABLE OF CONTENTS

I.     Overview of the Case ........................................................................ Page 4

II.    Factual Background ..................................................................... Page 7

III.   Motion to Dismiss Standard .................... ................................. Page 13

IV.    Plaintiff Has Pled a Cognizable §1983 Claim ......................... Page 14

V.     Defendant Mosby Is Not Entitled to Absolute Immunity ....... Page 15

VI.    Neither Defendant Mosby Nor Defendant Cogen is Entitled

       To Qualified Immunity ................................................................ Page 22

VII.   Neither of the Defendants Are Entitled to Maryland

       Statutory or "Public Official" Immunity Because the Complaint

       Sufficiently Alleges That Defendants Acted with Actual

       Malice and/or Gross Negligence ............................................. Page 22

VIII.  A Claim for Defamation Against Defendant Mosby.................. Page 30

IX.    The State Waived Sovereign Immunity For Plaintiffs'

       Defamation and Invasion of Privacy-False Light Claims Because

       Plaintiffs Complied with the MTCA; Plaintiffs Defamation Suit

       Was Timely Filed Within the One Year Statute of Limitations....... Page 38

            A.   The MTCA requirements do not apply to Count II

                 and Count IV which respectively allege defamation

                 and false light committed with malice........................ Page38

            B.   Contrary to Defendant Mosby's assertions, Plaintiffs

                 Substantially complied with the MTCA notice requirements

with respect to Counts I and III............................ Page 39

    C.  Plaintiffs Filed Their Defamation Claims

        Within the One Year Statute of Limitations....... Page 41

X.    The Plaintiffs Have Plead A Claim For Malicious Prosecution

    Against Defendant Mosby......................................................... Page 42

XI    Conclusion        ......................................................... Page 45

# I.     <u>OVERVIEW</u>

This lawsuit arises out of the arrest and subsequent untimely death of Freddie Gray in April 2015, and the ensuing investigation, indictment, and arrest of the six officers that were in any way involved –no matter how minimally— with Mr. Gray on that unfortunate day.  It further involves an incendiary and defamatory press conference on May 1, 2015, wherein State's Attorney, Marilyn Mosby, placated an angry crowd by falsely representing that the six officers were criminally liable for Mr. Gray's death.

The events immediately after Mr. Gray's death giving rise to this lawsuit must be placed in context.  Baltimore City erupted in the worst riots that the City had seen in almost 50 years since 1968.  Racial tensions were extremely high due, in large part, to anger over instances of police brutality not only in Baltimore, but across the country.  On April 13th, 2015, Defendant Mosby initiated an independent investigation through her Police Integrity Unit separate and apart from all other law enforcement agencies. On May 1, 2015, Defendant. Mosby held a press conference at which she stated,

> [I]nvestigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr. Gray's apprehension. Over the course of our independent investigation . . . my team worked around the clock; 12 and 14 hour days . . .   [t]he findings of our comprehensive, thorough and independent investigation, coupled with the medical examiner's determination . . . that we received today . . . led us to believe that we have probable cause to file criminal charges.

Marilyn Mosby, State's Attorney for Baltimore City, May 1, 2015 Freddy Gray Press Conference (May 1, 2015) (transcript available at http://time.com/3843870/marilyn-mosby-transcript-freddie-gray/ ).

Defendant Mosby's investigative team deliberately withheld from the Medical Examiner the video tape or transcript of Donta Allen's statements prior to the Medical Examiner's report.

Donta Allen was arrested and transported with Mr. Gray in the same police van. Mr. Allen gave a video statement that Mr. Gray was banging his head against the interior of the police van as it transported them. The Medical Examiner issued her report without the benefit of this information or that the emergency medic who responded to the side of Mr. Gray found no indication of a neck injury. After receiving this report, Defendant Mosby presented her investigative conclusions to Defendant Cogen. Defendant Cogen filed a Statement of Probable Cause under penalty of perjury. Afterward, Defendant Mosby met with the Gray family to gather more information, then decided to seek the arrest of the Plaintiffs. Defendant Mosby's intentions in conducting her own "independent" investigation, bringing charges based on that investigation, arresting and imprisoning the Plaintiffs, and then pursuing prosecution, were revealed in her own words during her May 1st press conference where she proclaimed to a cheering crowd that she heard their call of "no justice no peace" and allied herself proclaiming to the young people that "our time is now." *See* May 1, 2015 Freddy Gray Press Conference.

Indeed, on May 1, 2015, the State's Attorney for Baltimore, Defendant Marilyn Mosby, announced charges against the six officers including Plaintiff Alicia White, whose only involvement with Freddie Gray was very briefly checking on him when he was in the back of the police van, and Plaintiff William Porter, who assisted Freddie Gray upon his request, by picking him up off of the van floor and placing him on the bench. Despite that both officers had very limited and brief encounters with Mr. Gray and were not involved in his arrest, they were both charged with murdering him.

As was very specifically pled in Plaintiffs' complaint, it is Plaintiffs' contention that Ms. Mosby and Major Cogen did not bring charges against the six officers in a sincere attempt to prosecute criminal conduct, but rather levied the charges for political purposes, to place

unfounded blame on any policeman that was in any way even remotely involved with Freddie Gray in April 2015, to quell the riots and appease an angry crowd. Near the conclusion of her press conference, Ms. Mosby herself directed a "message" to the world:

> To the people of Baltimore and the demonstrators across America, I heard your call for 'no justice no peace.' Your peace is sincerely needed as I work to deliver justice on behalf of this young man ... [T]o the youth of the city. I will seek justice on your behalf. This is a moment. This is your moment. Let's insure we have peaceful and productive rallies that will develop structural and systemic changes for generations to come. You're at the forefront of this cause and as young people, our time is now.

*See* May 1, 2015 Freddy Gray Press Conference. This was not the first nor only statement revealing the State's Attorney's political and personal motivation beyond that called for by her office.

Plaintiffs' Second Amended Complaint (herein, the "Complaint") avers that Defendant Mosby conducted the investigation leading to Plaintiffs' charging and arrest, drafted the statement of charges, drafted the statement read by Detective Danielle Taylor to the grand jury, and essentially testified –through Assistant State's Attorney, Janice Bledsoe– to the grand jury. Plaintiffs allege that the Statement of Charges was unsupported by probable cause; that Mosby during the course of the investigation fabricated evidence, failed to investigate and develop other material evidence (such as how and precisely when Mr. Gray died), charged Plaintiffs with a reckless disregard for the truth (that they were not criminally responsible for Mr. Gray's death); misled the grand jury through presented misleading, biased, and fabricated testimony and evidence for purposes of securing an indictment; rushed the investigation and falsely charged the officers for political and other ulterior reasons, such as quelling the riots, rather than prosecuting criminal conduct.

The timing of Ms. Mosby's completion of what she termed a "thorough" and "independent" investigation further evidences her true political intentions. Ms. Mosby's

investigation lasted all of but 17 days, spanning April 13 to April 30th. Much of the legal community reacted that it was extremely atypical for an investigation in an alleged homicide to last only two weeks, when a homicide investigation would usually take much more time. *See* Casey Harper, *Five Mistakes Cost Marilyn Mosby The Freddie Gray Case*, THE DAILY CALLER (July 29, 2016, 4:05 PM), http://dailycaller.com/2016/07/29/five-mistakes-cost-marilyn-mosby-the-freddie-gray-case/. There was further reaction that it was extremely atypical for a prosecutor to represent to a crowd that criminal charges were being brought in response for the public's call for justice. *Id.*

The Complaint further alleges that Major Samuel Cogen signed the Statement of Charges, notwithstanding that no probable cause supported it. Plaintiffs allege that Defendant Cogen either acted with a reckless indifference to the truth of the allegations, or conspired with Defendant Mosby not to prosecute criminal conduct, but rather to appease angry, rioting crowds, and to achieve personal and political gain.

As is further discussed below, Plaintiffs' Complaint avers facts that meet a prima facie case for the counts alleged. Furthermore, given that Defendant Mosby far exceeded her role as advocate for the State, she cannot avail herself of the absolute immunity from suit that she otherwise would enjoy.

## II.  FACTUAL BACKGROUND

This case arises from the wrongful arrest and imprisonment of Plaintiffs Alicia White and William Porter on May 1, 2015. Plaintiffs White and Porter were wrongfully arrested and imprisoned as a result of their involvement in the legal arrest of Freddie Carlos Gray, Jr. ("Mr. Gray") in Baltimore City, Maryland on April 12, 2015. (Second Amended Complaint ¶¶ 8, 42).

On the morning of April 12, 2015, Officers Nero and Miller were on bicycle patrol with Lieutenant Brian Rice ("Lieutenant Rice") on North Avenue in Baltimore, Maryland. (Second Amended Complaint ¶¶ 9, 10).

Lt. Rice began pursuing two suspects and called for foot pursuit. (Second Amended Complaint ¶¶ 11, 12, 13). Plaintiff Porter was in the midst of inspecting the assigned patrol vehicle when he received and responded to a radio dispatch announcing a foot chase in the area of Westwood Avenue and Bruce Street. (Second Amended Complaint ¶ 44). Officer Miller pursued one of the suspects, who was later identified as Mr. Gray. (Second Amended Complaint ¶ 14). Officer Miller detained and handcuffed Mr. Gray for officer safety reasons. (Second Amended Complaint ¶ 15). Plaintiff Porter proceeded to the area of Bruce Street and Fulton Avenue to assist Lt. Rice in the search for the second person believed to be with Mr. Gray, who detained by Officer Edward Nero and/or Officer Garrett Miller; neither Plaintiff Porter or Lieutenant Rice located the second individual. (Second Amended Complaint ¶ 46).

Officer Miller recovered a spring assisted knife from Mr. Gray's front pocket. (Second Amended Complaint ¶ 17). The knife that Officer Miller recovered from Mr. Gray's possession was illegal under the Baltimore City Code. (Second Amended Complaint ¶ 75).

Mr. Gray became physically and verbally combative. (Second Amended Complaint ¶ 18). A crowd of citizens began to form near the scene. (Second Amended Complaint ¶ 23). Plaintiff Porter walked over to assist with crowd control. (Second Amended Complaint ¶ 48). A call for additional police officers was made. (Second Amended Complaint ¶ 28). When the police transport wagon arrived, Mr. Gray refused to walk to the wagon on his own and resisted while being walked to the wagon. (Second Amended Complaint ¶ 22). Plaintiff Porter observed from a

distance several officers engaged in the placement of an individual into the transport wagon. (Second Amended Complaint ¶ 49).

Once in the wagon, Mr. Gray began banging and slamming himself against the inside of the wagon causing the wagon to shake. (Second Amended Complaint ¶ 22). Plaintiff Porter could observe that the arrested individual who was fully inside the police wagon appeared to be banging and slamming himself against the inside of the wagon causing the wagon to visibly shake. (Second Amended Complaint ¶ 51).

Mr. Gray's screaming and yelling caused a crowd to form around the officers. (Second Amended Complaint ¶¶ 18, 23). As a result, Lt. Rice instructed the police wagon driver to move the vehicle approximately one block south. (Second Amended Complaint ¶ 23).

At this location,[1] Mr. Gray was taken out of the wagon and his handcuffs were replaced with flex cuffs; leg shackles also were placed on Mr. Gray. (Second Amended Complaint ¶ 24). Mr. Gray continued to flail, yell and scream and bang against the inside of the wagon. (Second Amended Complaint ¶ 25). A group of citizens began to crowd around the police wagon, and were yelling and shouting at the officers. (Second Amended Complaint ¶¶ 25, 29). Mr. Gray was placed back into the wagon, and Mr. Gray's arrest paperwork was provided to the driver of the wagon. (Second Amended Complaint ¶ 24). Neither Officer Nero nor Officer Miller had any further interaction with Mr. Gray. (Second Amended Complaint ¶ 30). Plaintiff Porter returned to his patrol vehicle and intended on commencing his patrol duties when he heard and responded to a radio call from the operator of the transport wagon requesting that an additional police unit respond to the intersection of Druid Hill Avenue and Dolphin Street. (Second Amended Complaint ¶ 52).

---

[1] This location is sometime referred to as the "second stop," although this specific phrase is not used in the Complaint.

When Plaintiff Porter responded to the intersection of Druid Hill Avenue and Dolphin Street, he found that the transport wagon containing Mr. Gray was stopped and parked at this location. (Second Amended Complaint ¶ 53). Plaintiff Porter observed Freddie Gray lying in a prone position on the floor of the vehicle, with Mr. Gray's head was at the front of the transport compartment of the vehicle and his body wedged between the interior dividing wall and the wheel well partition secured to the bench that runs along the exterior wall of the transport wagon. (Second Amended Complaint ¶ 55). When Plaintiff Porter heard Mr. Gray say, "Help", Plaintiff Porter responded by saying, "What do you mean help?" (Second Amended Complaint ¶ 56). Mr. Gray then replied by requesting that Plaintiff Porter provide assistance in helping him get up. *Id.* Mr. Gray did not appear to be in any medical distress, nor did he complain of any injury at this time. *Id.* Plaintiff Porter assisted Mr. Gray to a sitting position on the bench of the transport wagon by lifting him under his arms. *Id.* Plaintiff Porter then removed himself by backing out of the transport compartment. *Id.*

Plaintiff Porter inquired if Mr. Gray wanted to see a medic and/or if he wanted medical help, although Plaintiff Porter observed no exigent medical need, and observed Mr. Gray to be able to sit upright, breathe and communicate with Plaintiff Porter. (Second Amended Complaint ¶ 57). Mr. Gray, despite no signs of exigent medical needs, indicated that he did want to have medical assistance. (Second Amended Complaint ¶ 58). Plaintiff Porter advised Officer Goodson that he would need to transport Mr. Gray to the hospital, and then returned to his patrol car, leaving Officer Goodson with Mr. Gray. (Second Amended Complaint ¶¶ 58–60). Plaintiff Porter proceeded to the area of North Avenue and Carey Street in response.

In the meantime, Officer Nero and Officer Miller left the area of Bruce Street and Fulton Avenue and traveled back to North Avenue, where they stopped and subsequently arrested another

individual.  *Id.*  Lieutenant Rice called for additional units and a police wagon to transport the individual; Plaintiff Alicia White responded to the call for backup with Officer Wood and proceeded to North Avenue. (Second Amended Complaint ¶¶ 30, 31).  Plaintiff Porter also responded to this call.  (Second Amended Complaint ¶ 60).

When Plaintiff Alicia White approached the transport van and looked in, she saw Mr. Gray sitting in between the seat and the floor of the back of the police wagon, with his head down, leaning over.  (Second Amended Complaint ¶¶ 32–34).  While Mr. Gray did not verbally respond to Plaintiff White's attempts to speak with him, Plaintiff White observed him making noises and breathing.  (Second Amended Complaint ¶ 35).  At this time, she did not see that Mr. Gray was in any kind of distress, and concluded that his non-responsiveness was due to Mr. Gray continuing to be uncooperative and non-compliant.  *Id.*  Plaintiff White did not have any conversations with anyone else suggesting that Mr. Gray needed medical attention and departed from the scene. (Second Amended Complaint ¶¶ 36–37).

Upon arriving at this location Plaintiff Porter observed that several officers had arrested another individual and they were in the process of placing him in the transport wagon that contained Mr. Gray.  (Second Amended Complaint ¶ 61).  Plaintiff Porter was able to look into the back of the transport wagon and observed Mr. Gray kneeling on the floor of the transport wagon.  *Id.*  Plaintiff Porter inquired of Mr. Gray if he still wanted to go to the hospital and Mr. Gray responded in the affirmative; Plaintiff Porter conveyed this information to another police officer at the scene.  *Id.* Plaintiff Porter was advised that he would need to respond to the hospital with Mr. Gray since the other officers, who were operating bicycles, would need to stay together. (Second Amended Complaint ¶ 62).  Plaintiff Porter was thus instructed to meet the transport wagon at the Western District.  *Id.*

Plaintiff Porter met the transport wagon at the Western District as instructed and discovered Mr. Gray to be non-responsive to both voice and touch upon opening the door of the transport wagon. (Second Amended Complaint ¶¶ 63–64). At this time another officer started to render emergency assistance while Plaintiff Porter called for a medic. When Plaintiff White returned to the Western District, she saw officers attempting to take Mr. Gray out of the police wagon. (Second Amended Complaint ¶ 39). Plaintiff White heard one officer ask whether Mr. Gray was breathing, at which point, Plaintiff White advised to call a medic. (Second Amended Complaint ¶ 40). This was the first time that Plaintiff White had any reason to believe that Mr. Gray needed medical attention; indeed, as soon as Plaintiff White was aware that Mr. Gray was in distress, she took immediate steps to facilitate him getting medical attention. At that point, an officer informed Plaintiff White that a medic had already been called. Plaintiff White then got on the radio to confirm that a medic was in route. (Second Amended Complaint ¶ 41). Plaintiff Porter accompanied the medic unit to the University of Maryland Shock Trauma Unit, where he stayed until relieved of his duty. (Second Amended Complaint ¶¶ 65–66). On April 19, 2015, Mr. Gray passed away after undergoing surgery at the University of Maryland Shock Trauma Unit. (Second Amended Complaint ¶ 67).

On May 1, 2015, Defendant Cogen submitted an Application for Statement Charges after being provided with legal advice from Defendant Mosby and/or other members of the State's Attorney's Office who were acting under her direct instructions that probable cause existed to charge the Plaintiffs. (Second Amended Complaint ¶¶ 68, 69, 85, 86). This legal advice was provided to Defendant Cogen even though Defendant Mosby knew that no probable cause existed to charge the Plaintiffs with any crime. (Second Amended Complaint ¶ 86).

On May 1, 2015, after the Officers were arrested, Defendant Mosby held a press conference. (Second Amended Complaint ¶¶ 72–82). The transcript of the press conference is deemed incorporated into the Complaint pursuant to the Court's August 8, 2016 order (Dkt. No. 19). During the press conference, Defendant Mosby revealed that her office had conducted an "independent" investigation in addition to the investigation that was being performed by the Baltimore City police department. *See* Dkt. 19 (transcript). [2]

### III.   <u>MOTION TO DISMISS STANDARD</u>

This Court frequently has described the pleading requirements of a complaint subject to a motion to dismiss:

> A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6)2 tests the legal sufficiency of a complaint. A complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration in original) (citations omitted). When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or "a formulaic recitation of the elements of a cause of action will not [suffice]." *Id.* A complaint must allege sufficient facts "to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (*quoting Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

> Inquiry into whether a complaint states a plausible claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (*quoting Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (alteration in original)).

---

[2] Although the Plaintiffs refer to some portions of Application of Statement of Charges read by Defendant Mosby during her May 1, 2016 press conference, the Plaintiffs do no contend, nor are they required to admit, that all of the statements contained in the transcript are true. *Goines v. Valley Cmty. Services Bd.*, 822 F.3d 159, 167 (4th Cir. 2016) ("[I]n cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true.")

*E.E.O.C. v. Performance Food Group, Inc.*, 16 F. Supp. 3d 584, 588, 2014 WL 1760936 (D. Md. 2014) (footnote omitted).

## IV.     THE PLAINTIFFS HAVE SUFFICIENTLY PLED A CLAIM UNDER 42 U.S.C. § 1983

All but one of Plaintiff Nero and Plaintiff Miller's claims are Maryland state law claims. However, in Count VII (Nero) and Count VIII (Miller), the Plaintiffs have alleged that the Defendants in this action deprived them of their constitutional rights under 42 U.S.C. § 1983 as follows:

> a.  freedom from the deprivation of liberty without due process of the law, as guaranteed by the Fourteenth Amendment to the Constitution of the United States of America; and
>
> b.  freedom from arrest without probable cause, as guaranteed by the Fourth Amendment to the Constitution of the United States of America.

Complaint ¶¶ 113, 217.  The Plaintiffs may bring a claim under § 1983 as they allege that, under the Fourth Amendment to the United States Constitution, each of them has the absolute right to be free from arrest and detention without probable cause, legal excuse or justification, and without a valid warrant. Plaintiffs Nero and Miller also have the unequivocal right to be free from wrongful imprisonment.  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to any party injured in an action at law.

42 U.S.C. § 1983.

To prove a § 1983 violation, a plaintiff must establish that: (1) a person acted under color of state law in the conduct being complained of; and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

In moving to dismiss the Complaint, neither Defendant alleges that they were acting outside of the color of state law. Because Plaintiffs Rice and Miller have sufficiently pled specific facts showing that each of their Fourth Amendment rights were violated by the Defendants, the motion to dismiss the Plaintiffs § 1983 claims must be denied.

## V.     DEFENDANT MOSBY IS NOT ENTITLED TO ABSOLUTE PROSECUTORIAL IMMUNITY

Defendant Mosby contends that she is entitled to absolute immunity in her prosecutorial capacity as the State's Attorney for Baltimore City.  As demonstrated below, the Plaintiffs have alleged that Defendant Mosby engaged in certain "administrative" and "investigatory" actions that are only entitled to qualified immunity and not the absolute immunity that prosecutors receive when acting as "advocates."

The Supreme Court noted in *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S. Ct. 2606,  125 L. Ed. 2d 209 (1993) that "[i]n determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a 'functional approach,' *see, e.g., Burns [v. Reed]*, 500 U.S. [478] at 486, 111 S.Ct., 1934 at 1939 [(1991)], which looks to 'the nature of the function performed, not the identity of the actor who performed it,'" *Forrester v. White*, 484 U.S. [219] at 229, 108 S.Ct. [538] at 545 [(1988)]. *Buckley*, 509 U.S. at 269, 113 S. Ct. at 2613.

In *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S. Ct. 984, 995, 47 L. Ed. 2d 128 (1976), the Supreme Court held that a prosecutor was entitled to absolute immunity under § 1983 when the plaintiff alleged that the prosecutor had knowingly used false testimony at trial and had suppressed exculpatory evidence.  The Court emphasized that conduct in "initiating a prosecution and in presenting the State's case" "w[as] intimately associated with the judicial phase of the criminal process." *Id.*  The Court left open the questions as to "whether like or similar reasons require

immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Imbler*, 424 U.S. at 430–31, 96 S. Ct. at 995.

In *Burns v. Reed*, 500 U.S. 478, 486, 111 S. Ct. 1934, 1939, 114 L. Ed. 2d 547 (1991), the Supreme Court noted that its "[d]ecisions in later cases are consistent with the functional approach to immunity employed in *Imbler*." *Id*. The Court continued:

> These decisions have also emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. *Forrester, supra*, 484 U.S., at 224, 108 S.Ct., at 542; *Malley* [*v. Briggs*], 475 U.S., [335] at 340, 106 S.Ct., [1092] at 1095; *Harlow* [*v. Fitzgerald*], 457 U.S. [800], at 812, 102 S.Ct.[2727], at 2735; *Butz* [*v. Economou*], 438 U.S. [478] at 506, 98 S.Ct. [2894] at 2910. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been "quite sparing" in our recognition of absolute immunity, *Forrester, supra*, 484 U.S., at 224, 108 S.Ct., at 542, and have refused to extend it any "further than its justification would warrant." *Harlow*, *supra*, 457 U.S., at 811, 102 S.Ct., at 2734.

*Burns*, 500 U.S. at 486–87, 111 S. Ct. at 1939. The Supreme Court first held that "[t]he prosecutor's actions at issue here --appearing before a judge and presenting evidence in support of a motion for a search warrant-- clearly involve the prosecutor's 'role as advocate for the State,' rather than his role as 'administrator or investigative officer,' the protection for which we reserved judgment in *Imbler*, were protected by absolute immunity *Id*. at 478, 111 S.Ct. at 1942; however, the Court reached a different result when evaluating the prosecutor's "legal advice to the police regarding the use of hypnosis and the existence of probable cause to arrest petitioner." *Id*. at 478, 111 S.Ct. at 1394.

> The next factor to be considered-risk of vexatious litigation-also does not support absolute immunity for giving legal advice. The Court of Appeals asserted that absolute immunity was justified because "a prosecutor's risk of becoming entangled in litigation based on his or her role as a legal advisor to police officer is as likely as the risks associated with initiating and prosecuting a case." 894 F.2d, at 955-956. We disagree. In the first place, a suspect or defendant is not likely to be as aware

of a prosecutor's role in giving advice as a prosecutor's role in initiating and conducting a prosecution. But even if a prosecutor's role in giving advice to the police does carry with it some risk of burdensome litigation, the concern with litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process. *Forrester, supra*, 484 U.S., at 226, 108 S.Ct., at 543; *Imbler, supra*, 424 U.S., at 430, 96 S.Ct., at 995. Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation. *Forrester, supra*, 484 U.S., at 226, 108 S.Ct., at 543. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.

*Burns*, 500 U.S. at 494, 111 S. Ct. at 1943 ("[I]t is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice.").[3]

Accordingly, a prosecutor is not entitled to absolute immunity when providing legal advice to police as to the existence of probable cause. See *Goldstein v. Moatz*, 364 F.3d 205, 214 (4th Cir. 2004) ("In *Burns*, the Court confirmed the distinction between investigative and advocative activities in deciding whether absolute immunity should be accorded a prosecutor who provides legal advice to police officers concerning probable-cause issues or to a prosecutor's participation in a probable-cause hearing.")(emphasis added); *Ewing v. City of Stockton*, 588 F.3d 1218, 1233–34 (9th Cir. 2009) ("Although the Burns Court sometimes characterized the prosecutor's role as

---

[3] The Supreme Court noted that the circuit "courts are split on the issue of whether absolute immunity extends to the act of giving legal advice to the police." *Burns*, 500 U.S. at 483 n. 2, 111 S. Ct. at 1938 n. 2.:

> Since the decision in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), most Courts of Appeals have held that prosecutors are not entitled to absolute immunity for "investigative" or "administrative" acts. The courts, however, have differed in where they draw the line between protected and unprotected activities. For example, the courts are split on the issue of whether absolute immunity extends to the act of giving legal advice to the police. *Compare Wolfenbarger v. Williams*, 826 F.2d 930, 937 (10th Cir. 1987), *with Burns v. Reed*, 894 F.2d 949 (7th Cir 1990) (case below); *Marx v. Gumbinner*, 855 F.2d 783, 790 (11th Cir. 1988); *Myers v. Morris*, 810 F.2d 1437, 1449-1451 (8th Cir.), *cert. denied*, 484 U.S. 828, 108 S. Ct. 97, 98 L. Ed.2d 58 (1987). *Id.* The Seventh, Eighth and Eleventh circuits had held that a prosecutor was absolutely immune in rendering legal advice to police officers regarding the existence of probable cause. Those decisions were abrogated by the Supreme Court's *Burns* decision.

"investigative," it clearly held that with respect to advising police that they had probable cause to arrest, the prosecutor was not entitled to absolute immunity."); *Loupe v. O'Bannon*, 824 F.3d 534, 540 (5th Cir. 2016) ("In *Burns*, the Supreme Court held that giving legal advice to police, including advice as to whether there is probable cause to arrest a suspect, is not a function protected by absolute immunity."); *Spiess v. Pocono Mountain Reg'l Police Dept.*, 580 Fed. Appx. 116, 120 (3d Cir. 2014) ("Such investigative functions include giving legal advice to the police as to the existence of probable cause."); *Holden v. Sticher*, 427 Fed. Appx. 749, 751 (11th Cir. 2011) ("Prosecutors do not receive absolute immunity for giving legal advice to police where a prosecutor guides police rather than where a prosecutor prepares his or her own case.") (*citing Burns*); *Prince v. Hicks*, 198 F.3d 607, 614–15 (6th Cir. 1999) ("Although the next few paragraphs of the complaint characterize Hicks and Hazelhurst as together initiating criminal proceedings against Prince, the complaint can be read to allege that Hicks gave Hazelhurst legal advice prior to the existence of probable cause and prior to Hicks's determination that she would initiate criminal proceedings against Prince. Hazelhurst then 'executed the warrant in reliance, in whole or in part, on that advice.' At the time this advice was given, Hicks would not have been acting as an advocate for the state. (citation omitted). *See also Parton v. Dorning*, 5:15-CV-02221-CLS, 2016 WL 3543470, at *18 (N.D. Ala. June 29, 2016) ("In other words, 'legal advice,' as that term is used in *Burns*, means advice given to law enforcement about a legal matter, such as whether probable cause exists or whether law enforcement may use an interrogation tactic.").

The Supreme Court next identified more exceptions to prosecutorial immunity in *Buckley v. Fitzsimmons*, 509 U.S. 259, 273–74, 113 S. Ct. 2606, 2615–16, 125 L. Ed. 2d 209 (1993), which involved issues of a prosecutor's involvement in an investigation and statements made by the prosecutor during a press conference.

[A]s the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity " 'represents the norm' " for executive officers, *Malley v. Briggs*, 475 U.S., at 340, 106 S.Ct., at 1095, *quoting Harlow v. Fitzgerald*, 457 U.S., at 807, 102 S.Ct., at 2732, so when a prosecutor "functions as an administrator rather than as an officer of the court" he is entitled only to qualified immunity. *Imbler*, 424 U.S., at 431, n. 33, 96 S.Ct., at 995, n. 33. There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

*Buckley*, 509 U.S. at 273, 113 S. Ct. at 2615-16.  Accordingly, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274, 113 S. Ct. at 2616.[4]

With respect to statements made at a press conference, "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Buckley*, 509 U.S. at 277, 113 S. Ct. at 2618.  "The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Id*.  Accordingly, "in these respects a prosecutor is in no different position than other executive officials who deal with the press, and…qualified immunity is the norm for them." *Id*.

Under the Supreme Court cases, the Plaintiffs have pled three exceptions to any claim by Defendant Mosby to absolute immunity.

First, the Plaintiffs allege that Defendant Mosby provided legal advice that to Defendant Cogen that probable cause existed "even though Defendant Mosby knew, prior to the filing of the

---

[4] Moreover, "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Buckley*, 509 U.S. at 276, 113 S. Ct. at 2617.

Application for Statement of Charges that no probable cause existed that either Plaintiff Miller or Plaintiff Nero had committed any crime." Complaint at ¶ 71 ("Alternatively, <u>Mosby provided erroneous legal advice to Defendant Cogen</u>, prior to his filing of the Application for Statement of Charges, <u>that probable cause existed to charge and arrest Defendants Miller and Nero</u>, even though Defendant Mosby knew, prior to the filing of the Application for Statement of Charges that no probable cause existed that either Plaintiff Miller or Plaintiff Nero had committed any crime.")(emphasis added). The Plaintiffs further allege that "Defendant Mosby provided this erroneous legal advice either directly to Defendant Cogen and/or instructing another member of the Baltimore City State's Attorney's office to provide this erroneous legal advice to Defendant Cogen." *Id*. Since "[a]s a result of the improper actions of Defendants Mosby and Cogen, Plaintiff Miller and Plaintiff Nero were illegally arrested on May 1, 2015 (Complaint at ¶ 72), Defendant Mosby is not entitled to absolute immunity in this circumstances since she was acting in her "administrative" or "investigatory" capacity when she provided this legal advice on probable cause.[5]

Second, Defendant Mosby directed a separate investigation by the Baltimore City State's Attorney's Office that she described during her May 1, 2015 press conference:

"Once alerted about this incident on April 13, investigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr.

---

[5] As demonstrated in more detail in the Defendants' argument on qualified immunity below, no probable cause existed because the claims against the Defendants were based on (1) the arrest of Mr. Gray being illegal because the knife in Mr. Gray's possession was legal (despite the knife being in actuality spring-assisted switchblade which was illegal under the Baltimore City Code) and (2) not placing Mr. Gray in a seat-belt at the second stop in light of a police general order (despite the order having only been issued a few days before the incident; despite a crowd "yelling and shouting at officers" while Mr. Gray was being placed in the police wagon at both stops; despite Mr. Gray being "uncooperative" and "continu[ing] to bang the inside of the wagon, causing the wagon to violently shake back and forth"; despite, according to one witness, Donta Allen, Mr. Gray continuing to bang on the wall while in the van; despite Mr. Gray being placed in the custody of the police wagon driver, who made subsequent stops during which Mr. Gray was observed, by police officers and at least one civilian witness, Mark Gladhill, not be in any form of medical distress; and despite, at one of the subsequent stops, Mr. Gray being moved from the floor, where the Defendants had placed him, to a bench in the wagon, but was not placed in a seat-belt by the wagon driver.

Gray's apprehension. Over the course of our independent investigation, in the untimely death of Mr. Gray, my team worked around the clock; 12 and 14 hour days to canvass and interview dozens of witnesses; view numerous hours of video taped statements; surveyed the route; reviewed voluminous medical records; and we leveraged the information made available to us by the police department, the community, and the family of Mr. Gray."

Marilyn Mosby, State's Attorney for Baltimore City, May 1, 2015 Freddy Gray Press Conference (May 1, 2015) (transcript available at http://time.com/3843870/marilyn-mosby-transcript-freddie-gray/ ) ("We have been working with the police department from day one, and from day one I also sent my own investigators to the scene . . . I thought it was very important to have an independent analysis as to what took place and transpired from the very beginning").

Defendant Mosby's acts during her "independent" investigation —which occurred simultaneously with an investigation being performed by the Baltimore City Police Department— are not those of an "advocate" and, therefore, are not entitled to qualified immunity. *See Prince*, 198 F.3d at 613.[6] Defendant Mosby is not entitled, during this investigation phase, to be treated any different than police officers who were performing the exact same type of investigation; therefore, qualified immunity should apply.

Finally, Ms. Mosby does not have immunity under § 1983 for statements made by her during her May 1, 2015 press conference as her status as a prosecutor during a press conference is no different than any other executive official. *Buckley*, 509 U.S. at 277, 113 S. Ct. at 2618. In sum, Defendant Mosby is not entitled to absolute immunity to the Plaintiffs § 1983 claims. (The same

---

[6] "Prince claims that Hicks engaged in unconstitutional conduct when she 'undertook to perform an investigation of the circumstances surrounding [the daughter and son-in-law's] complaints or, alternatively, performed no investigation or a grossly inadequate investigation.'". Because Hicks has failed to meet her burden to show that the alleged investigation or failure to investigate was intimately associated with the judicial phase of the criminal process, the district court properly refused to dismiss the allegations contained in ¶ 13 of the amended complaint on absolute immunity grounds. *Prince*, 198 F.3d at 613.

analysis would apply to Defendant Mosby's claims for prosecutorial immunity under Maryland law with respect to the Defendants' state based claims.).[7]

## VI.    NEITHER DEFENDANT MOSBY NOR DEFENDANT COGEN IS ENTITLED TO QUALIFIED IMMUNITY

In qualified immunity cases, Courts must identify with particularity the right that the official is alleged to have violated. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). Rather than characterizing such right as the general right to be free from arrest without probable cause, the right at issue here is the right to be free from arrest under the circumstances presented in this case. *Id.* ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (emphasis added)). In other words, Defendant Cogen loses the protection of qualified immunity if it would have been clear to a reasonable officer in his position that he or she lacked probable cause to seek the charges against the Plaintiffs. *See Pritchett v. Alford*, 973 F.2d 307, 313-14 (4th Cir. 1992) ("[T]he right in issue was the right not to be arrested except upon probable cause to believe that [the plaintiff] had violated [the regulation at issue]."). That is the case here. Defendant Cogen is chargeable with knowledge of the law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)

---

[7] The Maryland Court of Appeals has stated:

What emerges from these cases, and from other cases as well, is that the extensive case law emanating from the Supreme Court of the United States on the subject of the immunity of governmental officials, albeit not of constitutional dimension and not, therefore, binding authority in Maryland, is nonetheless a highly persuasive body of law to which this State has regularly looked for enlightenment.

*Simms v. Constantine,* 113 Md. App. 291, 304, 688 A.2d 1, 7 (1997) (discussing I*mbler, Burns* and *Buckley* and affirming denial of absolute immunity by prosecutors based on allegations that "the two prosecutors 'manipulated evidence and, in effect, falsified evidence' against the three plaintiffs so as 'to ensure that an indictment against them would be forthcoming" and engaged in investigations). Given the Court of Appeals reliance on the *Burns* and *Buckley*, Defendant Mosby is not entitled to absolute immunity in the Maryland state law based claims for the same reason she is not entitled to immunity for the Plaintiffs § 1983 claims.

The qualified immunity analysis involves two steps. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Generally, a court first considers "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and second, when the court finds such a violation, whether the right violated was "clearly established." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013); *see Graham v. Gagnon*, ___ F.3d. ___, 15-1521, 2016 WL 4011156, at *4 (4th Cir. July 27, 2016) ("The shield of qualified immunity is lost when a government official (1) violates a constitutional right and (2) that right was clearly established."). In performing this analysis, however, a court is not required to consider these two steps in any particular order. *Williams*, 716 F.3d at 805–06. A court may exercise its discretion to determine which of the two steps in the qualified immunity analysis "should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 806 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

The "clearly established" prong is "a test that focuses on the objective legal reasonableness of an official's acts." Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "[C]onduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" such that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)(citations omitted). "The inquiry is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances." *Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir. 2003).

The right at issue here is not the general right to be free from arrest without probable cause,

but rather the right to be free from arrest under the particular circumstances of the case. *Graham v. Gagnon*, 15-1521, 2016 WL 4011156, at *4 (4th Cir. July 27, 2016)(*citing Pritchett v. Alford*, 973 F.2d 307, 313–14 (4th Cir. 1992).

> Framing the right as the general right to be free from arrest without probable cause would frustrate the purpose of qualified immunity. It is clearly established that the Fourth Amendment prohibits police officers from arresting individuals without probable cause. *See, e.g., McAfee v. Boczar*, 738 F.3d 81, 87 (4th Cir. 2013); *Miller v. Prince George's Cty.*, 475 F.3d 621, 627 (4th Cir. 2007). But framing the right at that level of generality would mean that the "clearly established" prong would automatically be met in every suit alleging an arrest without probable cause. The immunity analysis would then turn solely on whether the officer correctly concluded that probable cause existed, eliminating the "breathing room" to make reasonable mistakes. Qualified immunity does not shield officials from liability for all of their mistakes, but it does shield them when their mistakes were reasonable.

*Graham*, ___ F.3d. ___, 15-1521, 2016 WL 4011156, at *4 n. 1 (reversing grant of summary judgment in favor of officers on qualified immunity).

"Unquestionably, '[t]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.'" *Miller*, 475 F.3d at 627 (*quoting Brooks v. City of Winston–Salem*, 85 F.3d 178, 183 (4th Cir. 1996)). Accordingly, "[a] plaintiff's allegations that police seized him 'pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor are sufficient to state a ... claim alleging a seizure that was violative of the Fourth Amendment." *Miller*, 475 F.3d at 627 (*quoting Brooks*, 85 F.3d at 183–84).

In cases alleging that a warrant was issued without probable cause, the law enforcement officer who requested the warrant loses immunity from suit "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 345, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). In *Malley*, the Supreme Court advised lower courts to ask whether

a reasonably well-trained officer . . . would have known that [the affidavit in question] failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest.

*Id.*

In *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000), the Fourth Circuit explained that the question of whether probable cause existed to file the Application for Statement of Charges is a fact intensive analysis:

Probable cause exists when the facts and circumstances within an officer's knowledge—or of which he possesses reasonably trustworthy information—are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed. In assessing whether probable cause exists, we must examine the totality of the circumstances. Determining whether the information surrounding an arrest suffices to establish probable cause is an individualized and fact-specific inquiry.

*Wadkins*, 214 F.3d at 539. In *Miller*, the Fourth Circuit described that the plaintiff "alleges here that his seizure was unreasonable because it followed from a warrant affidavit that was deficient because it was dishonest." *Miller*, 475 F.3d at 627.

To succeed on his claim, Plaintiff must prove that Det. Dougans deliberately or with a "reckless disregard for the truth" made material false statements in his affidavit, Franks, 438 U.S. at 171, 98 S.Ct. 2674, or omitted from that affidavit "material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." United States v. Colkley, 899 F.2d 297, 300 (4th Cir.1990) (internal quotation marks omitted).

*Id.* "'Reckless disregard' can be established by evidence that an officer acted "'with a high degree of awareness of [a statement's] probable falsity," that is, "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627 (citation omitted). "With respect to omissions, 'reckless disregard' can be established by evidence that a police officer "failed to inform the judicial officer of facts [he] knew would negate probable cause." *Id.* (citations

omitted).

Plaintiffs were charged with manslaughter, second degree assault, and misconduct in office. In *Durham v. Horner*, 690 F 3d 183 (2012), the Court considered whether a constitutional violation had occurred in an instance where a criminal proceeding in which the wrong individual was arrested in a case of mistaken identity. The Court concluded that although the underlying criminal proceedings were terminated in Plaintiff's favor, the prosecution was supported by probable cause. In finding that there was probable cause, the Court ruled that such a finding was supported by an indictment, "fair upon its face," being returned by a grand jury in which the arresting officer did not testify.

The *Durham* case, however, was significantly distinguishable from this case in that in *Durham*, there was no attempt by law enforcement to mislead or otherwise taint the grand jury. The Court went on to say, "Notwithstanding the conclusive effect of the indictments, our precedents instruct that "a grand jury's decision to indict … will not shield a police officer who deliberately supplied misleading information that influenced the decision." *Citing Goodwin v. Metts*, 885 F.2d 157 (4th Cir. 1989); *Miller v. Prince George's County, MD*, 475 F.3d 621 (4th Circ. 2007) ("observing that 'the Constitution did not permit a police officer …with reckless disregard for the truth, to make material misrepresentations or omissions to seek [an arrest] warrant that would otherwise be without probable cause."). *See also Miller v. Prince George's County, Md.*, 475 F.3d 621, 631 (4th Cir. 2007) *citing Franks v. Delaware*, 438 U.S. 154 (1978) ("the Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts.")

The Fourth Circuit in *Miller* emphasized

The law was unquestionably clearly established at the time of the event … that the Constitution did not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause. No reasonable police officer …could believe that the Fourth Circuit permitted such conduct.  As we explained a decade ago, 'a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false.'
*Miller* at 632 *quoting Smith v. Reddy*, 101 F.3d 351, 355 (4th Cir. 1996).

As has been specifically pled, Plaintiffs allege that the Application for Statement of Charges was misleading in that it omitted material facts and presented conclusory statements implying that a crime had been committed, which were not true.  For example, Cogen and Mosby represented to the District Court Commissioner that Plaintiffs failed to render medical attention when it was not even known (and still is not) whether Mr. Gray needed medical attention at any time that Plaintiffs had any interaction with Mr. Gray. Defendants knew that the trained emergency medics who arrived at the scene wrote in their report that they observed no neck injury. Defendants omit that Officer White not only ordered her fellow officers to call for a medic but when one did not arrive promptly she then called for a medic herself. Defendants omit that the ambulance went to the wrong location after being called and had to be redirected to the Western District where Mr. Gray and the Plaintiffs were located.  Defendants Cogen and Mosby stated that Plaintiffs failed to seatbelt Mr. Gray –which led to his death—when the failure to seatbelt under the General Orders for the Baltimore City Police Department -does not even give rise to a crime.

Additionally, Plaintiffs allege that there were material factual omissions the Defendant Mosby's presentation to the grand jury, and that prosecutor Janice Bledsoe, assumed the role of witness in presenting biased facts in lieu of Detective Dawnyell Taylor, and prevented Detective Taylor from giving honest and accurate responses that would have otherwise provided exculpatory evidence. ¶ 100-102   As pled by Plaintiffs, the failure to provide an accurate

disclosure of facts, omission of material facts, and presentation of false facts tainted the grand

jury process. . ¶ 100-102   Thus, a grand jury indictment obtained through dishonest and

fraudulent means cannot give rise to establishment of probable cause.

Plaintiffs have specifically pled that the Statement of Charges and presentation to the

grand jury comprised bald, conclusory statements of fact of criminal wrongdoing wholly

unsupported by independent facts.  The standard to determine the existence of probable cause is

whether "there [is]… enough evidence to warrant the belief of a reasonable officer that an

offense has been or is being committed; evidence sufficient to convict is not required," *quoting*

*Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (analyzing §1983 false arrest claim under

Fourth Amendment's unreasonable seizure framework).

> It is Plaintiff's contention that no reasonable officer could have found probable cause
> with the dearth of supporting facts that Plaintiffs, or any of the other officers, had
> committed any crimes.  Whether Defendant Cogen acted "reasonably" in making
> application for the statement of charges given the dearth of any evidence that a crime
> had been committed by Plaintiffs is a question for the factfinder. Moreover, there is
> a material dispute between the Defendants as to the participation of Defendant
> Cogen. Defendant Cogen has filed an affidavit minimizing his role while Defendant
> Mosby indicates just the opposite. Defendant Mosby indicated in her May 1, 2015
> speech that her independent investigation was done in a "working collaboration with
> the Baltimore Sheriff's Department who had powers and again independent from
> the Baltimore City Police Department." . ¶81(i). Defendant Mosby listed this
> collaborative investigation to include witness interviews, reviewing videos,
> canvassing the flight, arrest, and transport of Mr. Gray and more. . ¶ 81. This material
> dispute can only be unfolded with allowing discovery to proceed.

Any reasonable prosecutor and police officer would know and understand – and as Judge Barry

Williams stated on the record in the Lt. Rice's criminal case, "case law makes it abundantly clear

that a violation of a general order may be an indicator that there is a violation of criminal law, but

failing to seat belt a detainee is not inherently criminal conduct.  More must be proven for a

conviction" See Reporter's Official Transcript of Verdict, Thursday July 18, 2016, at p. 24. Any

reasonable officer and prosecutor would also account for evidence of events after the Plaintiffs last

interacted with Mr. Gray, including evidence of Mr. Gray's lack of injury and his being placed from the floor (where the Plaintiffs had placed Mr. Gray) to a seat at a later stop. Moreover, the lack of any evidence that Plaintiffs acted "corruptly" is also readily evident,

With the lack of probable cause, no reasonable officer would have sought the arrest of the Defendants. See Miller, 475 F.3d at 632 (The law was unquestionably clearly established at the time of the events at issue here. Dougans had "fair warning" that the Constitution did not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause. No reasonable police officer in Det. Dougans's position could believe that the Fourth Amendment permitted such conduct."). Nor would a reasonable prosecutor advise anyone that probable cause existed to seek the Defendants' arrest. See *Ewing v. City of Stockton*, CIV. 2:05-2270, 2010 WL 3516351, at *9 (E.D. Cal. Sept. 2, 2010) {"On the other hand, if [prosecutor defendant] was unaware of the appearance of hair and blood on the Maglite and only considered the weak and vague identification of [plaintiff] and the circumstantial evidence that failed to distinguish [plaintiff] from any other Jus' Brothers member, the court is unable to conclude that a reasonable prosecutor trained in the law would have recommended that the officers add-book a murder charge against him.").

Given the factual issues involved in this qualified immunity analysis, the motions to dismiss must be denied to allow discovery to occur. *See DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir.1995) ("[W]here there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version of events he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved without discovery.").

Based on the foregoing, the Defendants; actions are not protected by qualified immunity. As

a matter of law and at this stage of the litigation, the Defendants' motions to dismiss on the Plaintiffs' § 1983 claims. Plaintiffs have properly pleaded their § 1983 claim, and there remain questions of fact regarding whether Defendants had the requisite probable cause to issue charges against the Plaintiffs.

## VII. NEITHER OF THE DEFENDANTS ARE ENTITLED TO MARYLAND STATUTORY OR "PUBLIC OFFICIAL" IMMUNITY BECAUSE THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS ACTED WITH ACTUAL MALICE AND/OR GROSS NEGLIGENCE.

Each Plaintiff has filed Maryland state law-based claims (defamation and false light, false arrest, false imprisonment, violation of the Maryland Declaration of Rights, malicious prosecution, and abuse of process) against both Defendants. Defendant Mosby contends that she is entitled to "public official" and statutory immunity from those claims, while Defendant Cogen relies solely on statutory immunity. Mosby Mem. at 21.

"[T]here are three prongs that must be satisfied in order for a government representative to qualify for [public official] immunity: (1) he or she must be a public official; and (2) his or her tortious conduct must have occurred while performing discretionary acts in furtherance of official duties; and (3) the acts must be done without malice." *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 140–41, 753 A.2d 41, 62 (2000). The Court of Appeals has recently modified the third condition to require the public official to show that he or she did not act either with malice or gross negligence. *Cooper v. Rodriguez*, 443 Md. 680, 723 (2015) (emphasis added) ("gross negligence is an exception to common law public official immunity").

Under the Maryland Tort Claims Act, "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article." Cts. & Jud.

Proc. § 12-105.[8]  Section 5-522, in turn, provides the following statutory immunity for state personnel.

> State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel <u>and is made without malice or gross negligence</u>, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver.

Cts. & Jud. Proc. § 5-522(b) (emphasis added).

With the Court of Appeals *Cooper* decision, the analysis of either form of immunity is the same:  both public official immunity and statutory immunity under § 5-522 are forfeited if a defendant acts with actual malice or gross negligence.[9]  As a result, public official and statutory immunity are sometimes referred to in Maryland cases as "qualified immunity."  *See Shoemaker*, 353 Md. at 158, 725 A.2d at 557 ("The immunity available to them, therefore, is a qualified, not an absolute, one.").  However, subjective "qualified immunity" under Maryland law is different from the objective "qualified immunity" under § 1983 because "in adopting a purely objective test for purposes of § 1983, the Supreme Court has clearly and expressly eliminated malice, which it regarded as the embodiment of subjectivity, from the immunity doctrine [while] [i]n enacting the State Tort Claims Act, the General Assembly just as clearly and expressly retained the subjective element for immunity purposes.  *Shoemaker*, 353 Md. at 161, 725 A.2d at 558.

---

[8]  The Plaintiffs do not contest that States Attorney Mosby Mosby and Deputy Sheriff Cogen are "state personnel."  See 12-101(a)(6) ("a sheriff or deputy sheriff of a county or Baltimore City) & (a)(8) ("a State's Attorney of a county or Baltimore City….")

[9] The Court of Appeals has retained one distinction between public official immunity and statutory immunity.  As the Court of Appeals noted in *Lee v. Cline*, 384 Md. 245, 258, 863 A.2d 297, 305 (2004), public official immunity does not apply to intentional or constitutional torts  ("[T]his Court has consistently held that Maryland common law qualified immunity in tort suits, for public officials performing discretionary acts, has no application in tort actions based upon alleged violations of state constitutional rights or tort actions based upon most so-called 'intentional torts.' The Maryland public official immunity doctrine is quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct."), while "immunity under the Maryland Tort Claims Act…encompasses constitutional and intentional torts."  *Lee*, 384 Md. at 267, 863 A.2d at 310.

In *Cooper*, the Court of Appeals, relying on Barbre v. Pope 402 Md. at 187, 935 A.2d 717, described gross negligence in the following terms:

> We have viewed gross negligence . . . as something more than simple negligence, and likely more akin to reckless conduct; gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.

*Cooper*, 443 Md. at 708, 118 A.3d at 846-47 (citations, emphasis, and internal quotation marks omitted and alteration added in *Cooper*). *See also Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004) ("[W]e view gross negligence as something more than simple negligence, and likely more akin to reckless conduct[.]"). "Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case[,] and is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached." *Cooper*, 443 Md. at 708-709, 118 A.3d at 846. (internal quotation omitted and alterations added in original). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Cooper*, 443 Md. at 709, 118 A.3d at 846. (citation and internal quotation marks omitted).

The "malice" under both public official immunity and statutory immunity under § 5-522 is "actual malice." *Shoemaker v. Smith*, 353 Md. 143, 163–64, 725 A.2d 549, 560 (1999). "'In the qualified immunity context, the Court of Appeals [has] affirmed that 'malice' has an 'actual malice' meaning, and requires a determination of whether the arresting officer's 'conduct, given all of the existing and antecedent circumstances, was motivated by ill will, [or] by an improper motive.... [T]hat motive or animus may exist even when the conduct is objectively reasonable.'"

*Francis v. Johnson*, 219 Md. App. 531, 563–64, 101 A.3d 494, 513–14 (2014), *cert. denied*, 442 Md. 516, 113 A.3d 625 (2015) ) (*quoting Shoemaker*, 353 Md. at 164, 725 A.2d 549) . "Malice can be established by proof that the officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Id*. (citations omitted). "Malice may be inferred from the circumstances." *Id*. A.2d 159. See also Franklin v. Montgomery County, MD, CIV.A. DKC 2005-0489, 2006 WL 2632298, at *24 (D. Md. Sept. 13, 2006).

Of course, the Plaintiffs do not have to establish <u>both</u> gross negligence and actual malice; gross negligence, standing alone, defeat a claim of public official or statutory immunity. *See Cooper*, 443 Md. at 714, 118 A.3d at 849 (defendant officer not entitled to either public official or statutory immunity in light of evidence of gross negligence even though ["[i]t is undisputed that [officer] did not commit an intentional tort or act with malice.").

As demonstrated earlier, no probable cause existed to bring any charges against the Plaintiffs and the lack of probable cause was known by each of the Defendants. *See* Complaint ¶ 69, 71. The carefully worded—and misleading—statements in the Application reflect a conscious disregard for the Plaintiffs rights and an improper motive to support the "Defendant's own personal interests and political agendas" at the Plaintiffs' expense. Complaint ¶ 85-92. See also May 1 Transcript of Defendant Mosby's May 1, 2015 Press Conference ("To the people of Baltimore and the demonstrators across America: I heard your call for 'No justice, no peace.'… To those that are angry, hurt or have their own experiences of injustice at the hands of police officers I urge you to channel that energy peacefully as we prosecute this case I have heard your calls for 'No justice, no peace,' …Last but certainly not least, to the youth of the city. I will seek justice on your behalf. This is a moment. This is your moment.").

Even though no discovery had yet occurred, the allegations in the Complaint provide sufficient factual support that the Defendants acted with gross negligence and/or actual malice. Alternatively, the Plaintiffs should be allowed to proceed forward with discovery "[b]ecause the question of 'malice' turns on the arresting officer's motive and intent." *Thacker v. City of Hyattsville*, 135 Md. App. 268, 300, 762 A.2d 172, 189 (2000)

For these reasons, the Defendants attempt to invoke public official or statutory immunity must be denied.

### VIII.    A CLAIM FOR DEFAMATION AGAINST DEFENDANT MOSBY

To present a *prima facie* case for defamation, Plaintiffs must plead four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm. *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012). With regard to police officers, there is an additional requirement to show that the officer acted with "malice;" that is, that the officer knew his statement to be false, or acted with a "reckless disregard for the truth." *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989). Defendant Cogen does not dispute that Plaintiffs have pled the four elements, but rather argues that Plaintiffs failed to sufficiently plead that "[he] acted with reckless disregard as to the truth or falsity of the factual allegations" of the Statement of Charges, Cogen Motion at p. 24. Cogen attempts to escape liability by stating that he did not conduct the investigation and simply relied on the advice of the State's Attorney's office. Whether Defendant Cogen acted with malice, i.e., a reckless disregard for the truth, acted independently, or acted in concert with Defendant Mosby, is a question of fact for the fact-finder. A mere conclusory statement that Cogen did not

know of the falsity of the statement and that he did not act with malice is not enough to defeat a properly, and specifically pled complaint, as is the case here.

Defendant Mosby contends that she is entitled to protection from the Plaintiffs' claims under the "fair reporting privilege" described in *Piscatelli v. Van Smith*, 424 Md. 294, 309, 35 A.3d 1140, 1149 (2012) ("The fair reporting privilege is a qualified privilege to report legal and official proceedings that are, in and of themselves defamatory, so long as the account is "fair and substantially accurate."). As Defendant Mosby acknowledges, however, the "fair reporting" privilege can be lost if abused. Mosby Mem. at 31 (*citing Piscatelli*, 424 Md. at 307-08).

Defendant Mosby's analysis errs in arguing that "[n]or does the Complaint allege that the State's Attorney had 'actual knowledge' that any of her statements were false when she uttered them, or that she made the statement with the requisite 'intent to deceive.'" Mosby Mem at 39 (*quoting Piscatelli*, 424 Md. at 307). While Defendant Mosby blithely claims that the statement that "Mr. Gray was arrested without probable cause" was merely "offering a legal opinion" (Mosby Mem at 38), Defendant Mosby ignores that Mr. Gray's possession of an illegal knife constituted probable cause for his arrest, a fact which the Plaintiffs allege Defendant Mosby knew. Complaint ¶¶ 95. Moreover, it is a reasonable assumption that Defendant Mosby, as part of her "comprehensive, thorough and independent investigation" would have learned that a commissioner on April 12, 2015 had found probable cause for charges to be brought against Mr. Gray for possession of an illegal knife.

Despite her knowledge, Defendant Mosby only repeated the known inaccurate and false statement that "Lt. Rice, Officer Miller and Officer Nero failed to establish probable cause for Mr. Gray's arrest as no crime had been committed by Mr. Gray [and a]ccordingly, Lt. Rice, Officer

Miller and Officer Nero illegally arrested Mr. Gray." She also repeated the misleading statement that "[k]nife was not a switchblade was lawful under Maryland law."

Defendant Mosby also repeated the Application for Statement of Charges comments that Mr. Gray was not "secured by a seat belt while in the wagon, contrary to a BPD General Order," while ignoring evidence about the recent adoption of the General Order, Mr. Gray's lack of cooperation at the two stops, the gathering of crowds, the subsequent movement of Mr. Gray from the floor to the seat by another officer, and witness testimony about Mr. Gray's banging on the walls of the police wagon. She further repeated "at no point did [Officer Porter] restrain Mr. Gray nor did [he] render or request medical assistance."

Regarding Plaintiff White, Defendant Mosby recited "Sgt. Alicia White … observed Mr. Gray unresponsive on the floor of the wagon … spoke to the back of Mr. Gray's head. When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic. She made no effort to look or assess or determine his condition." Of course, Defendant Mosby omitted that Sgt. White did not know if Mr. Gray was in medical distress, and had no reason to summon help. She further omitted that Sgt. White summoned medical help as soon as she was aware that Mr. Gray was non-responsive. Mosby offered only conclusory statements that were wholly unsupported by facts that Plaintiffs White and Porter knew that Mr. Gray was in medical distress and did nothing to help him.

The selective and misleading reporting by Defendant Mosby undercuts any claim of "fair reporting." *Compare Rosenberg v. Helinski*, 328 Md. 664, 682, 616 A.2d 866, 875 (1992) ("Nor do we find Rosenberg's statements unfair in respect to what he did not say. His out-of-court comments reporting his own testimony, to the exclusion of other matters, did not result in a materially misleading account of the hearing.").

Following Defendant Mosby recitation of the misleading allegations of the Application for Statement of Charges, Defendant Mosby made other comments that continued the defamation of Plaintiffs White and Porter.  Defendant Mosby stated:

> To those that are angry, hurt <u>or have their own experiences of injustice at the hands of police officers</u> I urge you to channel that energy peacefully as we prosecute this case I have heard your calls for 'No justice, no peace,' however your peace is sincerely needed as I work to deliver justice on behalf of Freddie Gray.

In the context of the press conference, this statement effectively declares, by way of comparison, that Plaintiffs White and Porter's committed an "injustice" This statement is independently defamatory, especially given that many Baltimore City resident's "own experiences of injustice at the hands of police officers" likely would have included being arrested without probable cause— a charge falsely brought against Plaintiffs White and Porter.

Defendant Mosby continued.

> To the rank and file officers of the Baltimore Police Department, please know that these accusations of these six officers are not an indictment on the entire force

It is inconceivable that the "rank and file officers of the Baltimore Police Department" would be concerned that the charges against the six officers were "an indictment on the entire force." However, by making this statement, Defendant Mosby's denial sounds hollow and creates an impression that the Plaintiffs' actions were so egregious that those actions could have reflected on the entire force. Read in the context of the entire press conference, this statement is defamatory.

Similarly, Defendant Mosby stated:

> I can tell you that the actions of these officers will not and should not, in any way, damage the important working relationships between police and prosecutors as we continue to fight together to reduce crime in Baltimore.

There would be no reason why the actions of the Plaintiffs would affect the "working relationships between police and prosecutors."  However, by raising the issue, even while denying it, Defendant

Mosby is telling the public that the Plaintiffs' actions were so egregious that those actions could have affected those "working relationships." Given Defendant Mosby's knowledge of what actually occurred during the Plaintiffs interactions with Mr. Gray, those statements so exaggerate the Plaintiffs' action that the statements are defamatory.

Finally, to the extent that the Defendant Mosby was involved in the drafting of the Application for Statement of Charges, or directed the drafting, any privilege could be lost under the "self-reported statement exception" "if the defamer illegitimately fabricated or orchestrated events so as to appear in a privileged forum in the first place." *Rosenberg v. Helinski*, 328 Md. 664, 685, 616 A.2d 866, 876 (1992). Whether the self-reported statement exception applies in this case requires discovery from Defendant Mosby.

Since Plaintiffs have pled the elements for defamation, their defamation claims cannot be dismissed.

## IX. THE STATE WAIVED SOVEREIGN IMMUNITY FOR PLAINTIFFS' DEFAMATION AND INVASION OF PRIVACY-FALSE LIGHT CLAIMS BECAUSE PLAINTIFFS COMPLIED WITH THE MTCA; DENIED; PLAINTIFFS' DEFAMATION SUIT WAS TIMELY FILED WITHIN THE ONE-YEAR STATUTE OF LIMITATIONS

### A. The MTCA requirements do not apply to Count II and Count IV which respectively allege defamation and false light committed with malice

The MTCA is only a condition precedent to filing suit against the State for torts committed by "State personnel" that do not involve malice or gross negligence and are committed "within the scope of the public duties of the State personnel." State Gov't, §12-104; Cts. & Jud. Proc., § 5-522(a)(4). Defendant Mosby contends that Plaintiffs failed to meet the requirements of the Maryland Tort Claims Act with regard to their defamation and false light claims. With respect to Counts II and IV, Mosby's argument is entirely inapplicable as a matter of law because malice is alleged.

As Defendant Mosby states on page 41 of her Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, a public official plaintiff may recover in a defamation action by proving that the "statement was made with 'actual malice'-- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. V. Sullivan*, 376 U.S. 254, 279-80 (1964). Plaintiffs White and Porter's Second Amended Complaint Count II alleges Defamation with "Malice" (plead in the alternative to Count I - Defamation) and Count IV alleges Invasion of Privacy: False Light with "Malice." Count IV specifically alleges that "Mosby made the statements with knowledge of their falsity and with reckless disregard of their falsity in a manner that is highly offensive to a reasonable person" - which is a near verbatim recitation of the *Sullivan* standard Defendants acknowledge is controlling. *See Plaintiffs Second Amended Complaint at ¶166*. Count II specifically alleges that Defendant Mosby made the false and "defamatory statements with knowledge of their falsity and with the intent to harm Plaintiffs White and Porter." *See Plaintiffs Second Amended Complaint at ¶135*. In Maryland, malice is commonly defined as "intent to injure" which is essentially identical to the "intent to harm allegation" in the Plaintiffs Second Amend Complaint - Count II. *See Lee v. Cline*, 384 Md. 245, 268 (2004). Under applicable Maryland law, well-plead facts alleging malice are "sufficient to take a claim outside of the immunity and non-liability provisions of the MTCA." *Barbre v. Pope*, 402 Md. 157, 182 (2007).

It necessarily follows that Counts II and IV are outside the immunity and non-liability provisions of the MTCA and the Plaintiffs had no duty with respect to those claims to place the Defendants on notice through the MTCA's prerequisite conditions. The defamation and false light claims - Counts II and IV - cannot be dismissed on the basis of any purported non-compliance with MTCA.

## B. Contrary to Mosby's assertions, Plaintiffs substantially complied with the MTCA notice requirements with respect to Counts I and III

Defendant Mosby does not dispute that a timely tort claims notice was provided, but rather contests its sufficiency. Indeed, Mosby's sole contention is that Plaintiffs' notice did not precisely satisfy the statutory requirement to "contain a concise statement of facts that sets forth the nature of the claim, including the date and place of the alleged tort." State Gov't § 12-107(a). Significantly, Mosby cites to no case law –nor could she-- to support her position that the contents of Plaintiffs' notice are insufficient.

Mosby's restrictive interpretation of the MTCA misreads the statute itself and is contrary to Maryland law. The MTCA's own language indicates "shall be construed broadly, to ensure that injured parties have a remedy." State Gov't § 12-102; *See Condon v. State of Maryland-University of Maryland*, 332 Md. 481 (1993) (Legislature intended to construe MTCA broadly so that injured parties will be ensured remedy.). Contrary to Mosby's punitive interpretation of the MTCA notice

requirements, Maryland law is far more forgiving and requires only "substantial compliance" with the MTCA statutory requirements.

For example, in *Conaway v. State*, a claim was asserted against the State for allegedly negligent medical treatment of a State prison inmate. 90 Md. App. 234. The prisoner filed a timely claim, but did not make demand for specific damages, as required in § 12–107(a)(2) of the MTCA. *Id.* The Court of Special Appeals held that substantial compliance with the MTCA notice provision was sufficient to satisfy the condition precedent to the waiver of sovereign immunity, and further defined substantial compliance to be such communication that provides the State "requisite and timely notice of facts and circumstances giving rise to the claim," *Id.* at 246. The Court of Special Appeals specifically rejected the State of Maryland's arguments that the MTCA should be interpreted strictly and held that a claimant's failure to allege specific damages could not be fatal to the sufficiency of the claim. *Id*. at 246. A claimant does not need to literally comply with all the requirements MTCA § 12-107(a), provided the State has "sufficient written notice of the circumstances of the underlying incident to enable it to investigate the claim and respond by settlement or defense." *Id*. at 250. The *Conaway* court found it persuasive that the State has unable to investigate how it was handicapped in investigating appellant's claim because of some purported deficiency in the notice letter. *Id*. In sum if the claimant's notice serves the purpose of the statute, then there is substantial compliance. *Id*.

In the instant case, like in *Conaway*, the State received the requisite written notice but disputes the sufficiency of that notice based on the text of MTCA § 12-107(a). Again, similar to *Conaway*, Mosby's argument is a technical one geared toward eliminating remedies for the Plaintiff, which is in direct violation of the legislative intent. State Gov't § 12-102. It is not in dispute that Plaintiffs May 7, 2015 written notice provides notice that Plaintiffs intend to pursue

claims arising from the alleged improper conduct of Mosby, from May 1, 2015 forward, as it relates to Plaintiffs. This notice alone constitutes substantial compliance with the MTCA. As in *Conaway,* Mosby has also entirely failed to state how Plaintiffs' May 7, 2015 letter, through any alleged deficiency, handicapped the Defendants' ability to investigate Plaintiffs' claims or defend themselves in the instant matter against the defamation or false light claims. Moreover, specifically with regard to these two claims, the May 7, 2015 letter occurred after the May 1, 2015 press conference at issue and specifically identifies the date of incident as "May 1, 2015 and continuing." *See Tort Claim Notice* attached as Exhibit 6.Attachment 1 to Defendant Mosby's Motion. Additional reference is made to "charges filed against them on May 1, 2015" which were "not supported by probable cause or arguable probable cause." *Id*. Further it is alleged that the charges brought against the Plaintiffs are "patently false" and consist of "false statements." All of these references provide further notice to the State that Mosby's false and unsubstantiated statements about the Plaintiffs publicized to others is at the core of Plaintiffs' claims. Defamation and false light claims logically arise from these allegations and therefore confirm Plaintiffs substantially complied with the MTCA.

### C. Plaintiffs Filed Their Defamation Claims Within the One-Year Statute of Limitations

It is undisputed that the press conference occurred on May 1, 2015. Defendant Cogen correctly states that the applicable statute of limitations to file a defamation claim is one year. He incorrectly argues, however, that Plaintiffs filed their claim one day late on May 2, 2016. While it is true that the one-year time period would have run on May 1, 2016, that day was a Sunday. Maryland law is clear that if a time period runs on a weekend or holiday, the time period elapses on the next business day which, in this case, would have been on May 2, 2016, when Plaintiffs' complaint was filed. Maryland Rule 1-203(a)(2) ("The last day of the period so

computed is included unless: … (2) the act to be done is the filing of a paper in court and the office of the clerk of that court on the last day of the period is not open, or is closed for a part of the day, in which event the period runs until the end of the next day that is not a Saturday, Sunday, holiday, or a day on which the office is not open during its regular hours.")  Since Plaintiffs filed their complaint in the Circuit Court for Baltimore City on Monday, May 1, 2016 – the next day the Court was open—their complaint was timely filed within the one-year statute of limitations.

## X.  THE PLAINTIFFS HAVE PLEAD A CLAIM FOR MALICIOUS PROSECUTION AGAINST DEFENDANT MOSBY

In order to state a claim for malicious prosecution, a claimant must allege facts that demonstrate:

i.   that a criminal proceeding was instituted or continued against them;

ii.  that the proceeding terminated in favor of them;

iii. the absence of probable cause for the proceeding; and

iv.  malice, meaning that a primary purpose in instituting the proceeding was other than that of bringing the Plaintiffs to justice.

*Dipino v. Davis*, 354 Md. 18, 54 (1999). Defendant Cogen does not contest the claim for malicious prosecution. With respect to Mosby, it is readily conceded that elements one and two are satisfied. Mosby contests that Plaintiffs have alleged sufficient facts to support the third and fourth elements of a malicious prosecution claim.

In her Supplemental Motion to Dismiss, Mosby relies solely on the fact that there exists a public record of an indictment of the officers from a subsequently convened grand jury to pronounce that probable cause did exist. As explained below, the later grand jury indictment, however, cannot retroactively cure the alleged fabricated, false, withheld, and/or destroyed

evidence and intentionally faulty legal advice rendered by Mosby prior to that indictment. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 275-76 (1993).

The *Buckley* case dealt with similar allegations and is instructive on why Mosby's argument to dismiss must fail. In *Buckley*, the plaintiff, formerly a defendant to a murder charge, brought a 42 U.S.C. §1983 action against a state's attorney and other prosecutors. *Id*. Similar to the instant matter, the plaintiff claimed that the state's attorney's actions were done "in order to gain votes" in an upcoming primary election and that the state's attorney was under pressure to obtain an indictment in a case that had engendered "extensive publicity" and "intense emotions in the community" *Id*. at 262; *See e.g. Second Amended Complaint ¶ 74,82-83,222.* The conduct at issue was based on allegations that the state's attorney (1) retained an expert who he knew would fabricate an expert report linking a "boot print" at the site of a murder to the defendant/claimant; and (2) made false statements at a press conference announcing the accused's indictment. *Id*. The Court of Appeals for the Seventh Circuit held that the state's attorney was shielded by absolute immunity. *Id*. at 265. The Supreme Court granted certiorari, vacated the judgment and remanded the case for further proceedings. After the lower court affirmed its prior holding on remand, however, the Supreme Court again granted certiorari to reverse the Seventh Circuit's ruling of absolute immunity and again remanded the case. *Id*. 267.

In relevant part, the Supreme Court conducted a "careful examination of the allegations concerning the conduct of the prosecutors during the period before they convened a special grand jury..." while their "mission at that time was entirely investigative in character." *Id*. at 274. The Supreme Court provided the following informative analysis:

> After *Burns,* it would be anomalous, to say the least, to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested.

**That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as preparation for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial**. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

*Id*. at 270-71.

In *Buckley,* as in the instant matter, an indictment was ultimately obtained, however in *Buckley* it did not preclude plaintiffs claims. *Id*. The critical import of *Buckley* is that the subsequent indictment cannot retroactively shield earlier misdeeds committed while a prosecutor engaged in job functions other than being an advocate. The indictment upon which Mosby relies carries no weight if it was obtained, as alleged, based on actionable behavior meant to generate a miscarriage of justice against the Plaintiffs. *See e.g. Second Amended Complaint ¶ 70, 73*, 84-85 Plaintiff has further alleged, and Mosby herself publicly admitted, Mosby's personal involvement in conducting her own investigation, placing her in an investigative non-advocate role. *See e.g. Second Amended Complaint ¶* 81(a)-(i) and 84-112.

At this juncture it remains a factual question to resolve the issues surrounding the grand jury indictment. For example, Plaintiffs are entitled to discovery exactly what information was provided to the grand jury and/or to review transcripts or recordings of that proceeding. Plaintiffs contend that the indictment was not indicia of probable cause as it was based on fabricated evidence, misstatements, and the intentional withholding and destruction of exculpatory evidence. The origin of the intentionally deceptive and malicious presentation of evidence leading to the indictment was, upon information and belief, Mosby and/or Cogen. Based on *Buckley*, the

Defendants do not have absolute immunity, the indictment does not constitute probable cause if obtained through illegal and intentionally deceptive processes, and Plaintiffs are entitled to prove malicious prosecution occurred through litigation. For the foregoing reasons, the motion to dismiss the malicious prosecution claim must be denied.

## **CONCLUSION**

For the reasons set forth above, the Defendants' motions to dismiss must be denied.

Date: September 16, 2016.
Respectfully submitted,

_____/s/_____
Tony Garcia, Esq.,
Bates & Garcia, LLC
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201
Phone: (410) 814-4600
Fax: (410) 814-4604
Attorney for Alicia White and William Porter


_____/s/_____
Michael E .Glass, MBA, Esq.
The Michael Glass Law Firm
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201
Phone: (410) 779-0600
Fax: (410) 814-4604
mglass@mglasslaw.com

Attorney for Alicia White and William Porter

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this September 16, 2016, a copy of the foregoing

Motion, Order, and clean and stricken Amended Complaint were served, via first class mail,

postage prepaid, and via the Court's electronic filing system on:

Ankush Nayar, Esq.
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
tel. (410) 576-6300
fax (410) 576-7841
email: anayar@oag.state.md.us
*Attorney for Defendants*

Jason Robert Foltin, Esq.
Baltimore City Law Department
100 Holliday St. Lower Level
Baltimore, MD 21202
tel. (410) 396-3297
fax (410) 837-1152
email: Jason.foltin@oag.state.md.us
*Attorney for Defendants*

Sarah Elaine Gross, Esq.
Baltimore City Law Department
100 Holliday St. Lower Level
Baltimore, MD 21202
tel. (410) 396-3297
fax (410) 837-1152
email: sarah.gross@oag.state.md.us
*Attorney for Defendants*

          /s/ Tony Garcia      ,
          Tony Garcia, Esq.